54 A.3d 772

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
STANLEY CLIFF SMITH, A/K/A JERRY JOHNSON,
DEFENDANT–APPELLANT.

Argued September 26, 2011—Reargued March
12, 2012—Decided October 25, 2012.

*Alison S. Perrone*, Designated Counsel, argued the cause for appellant (*Joseph E. Krakora*, Public Defender, attorney).

*Dorothy A. Hersh*, Assistant Prosecutor, argued the cause for respondent (*Joseph L. Bocchini, Jr.*, Mercer County Prosecutor, attorney).

Judge WEFING (temporarily assigned) delivered the opinion of the Court.

Shortly before 5:30 p.m. on December 31, 2001, Robert Priester was shot to death while sitting in his automobile in the parking lot of the M & M Deli in Ewing, New Jersey. Defendant was charged with murdering Priester, and a jury found him guilty. The trial court sentenced him to serve thirty years in prison, subject to the parole ineligibility provisions of *N.J.S.A.* 2C:43–7.2. The Appellate Division affirmed defendant's conviction and sen-

tence in an unpublished opinion. Before this Court defendant contends that the police improperly obtained certain telephone toll records and that evidence developed from those telephone toll records should have been excluded at his trial. He also contends that certain remarks by the prosecutor in summation were so improper, he is entitled to a new trial. We reject these contentions and affirm.

I.

Robert Priester was a drug dealer in Trenton and was known by the street name RaRa. Priester had been involved in a dispute with another drug dealer, Jerome Roberts, known by the street name Righteous. Defendant, known by the street name Butter, was a friend of Roberts and a partner with him, both in the drug trade and in a Trenton clothing store, Blikka. The State's theory at trial was that defendant and Roberts, seeking revenge on Priester, arranged for two other men, Andre Bellinger and Khalif Johnson, to shoot him.

Detective Patrick Holt of the Ewing police force was the on-call detective when Priester was shot to death. He was dispatched to the scene and became the lead detective on the case. Holt spoke to Priester's father and sister shortly after the murder. Both told him of the dispute between Priester and Roberts. They related that months earlier, Priester had gone to New York City with a large sum of cash to restock his narcotics inventory but was unable to complete his purchase because he was robbed at gunpoint. Priester believed that Roberts had arranged the robbery. Holt learned that Priester and Roberts had since on several occasions exchanged gunfire. He also learned that several weeks before Priester's murder, Roberts was treated at a local hospital after having been shot by an unknown assailant.

In addition to speaking with Priester's father and sister, Holt also spoke to Priester's girlfriend. He learned from her that when Priester left on the morning of his murder, he took his ring, watch, and cell phone. She said she spoke to him on the cell

phone shortly before he was murdered. Priester's ring, watch, and cell phone could not be found after his death. She confirmed the information about the dispute between Priester and Roberts as did several of Priester's associates in his drug trade. Based on this information, Holt viewed Roberts as a likely suspect in Priester's death.

An autopsy on Priester was performed the next day. Four .38 caliber bullets were recovered during that autopsy. An examination of the bullets showed that each had been fired from the same weapon, which was identified preliminarily as possibly a Smith and Wesson .38 or .357 caliber.

On January 4, 2002, Holt spoke to Larry Dickerson, who had been arrested for shoplifting, but volunteered that he had information about Priester's murder. Dickerson first told Holt that he had seen someone shoot Priester through the car's front windshield and then run away. Holt knew this statement could not be correct, and he showed Dickerson a newspaper picture of Priester's car, with its front windshield intact and its driver's side window shattered. Dickerson then revised his story and said he saw a black male, dressed in black clothes, run up to Priester's car from the rear with a silver-colored gun and fire into the car and then flee. Holt considered the reference to a silver-colored gun to be significant because the police had received an anonymous phone call reporting the shooting, which had contained a reference to a silver-colored gun, but that detail had not been reported publicly. Dickerson said he did not know the shooter. Holt asked if he would be willing to take a polygraph, and Dickerson agreed. Holt confronted Dickerson with the results of the polygraph, which indicated he was being deceptive with respect to whether he could identify the shooter. Dickerson then told Holt that he recognized Roberts as the shooter and provided a written statement to that effect.

Based on that identification, an arrest warrant for Roberts issued on the following day, January 5, and Roberts was taken into custody. The police also obtained a search warrant for Blikka

and for Roberts's car. A subsequent search of the vehicle turned up an address book in which "Butter" and a telephone number were written on the first page. It also turned up a .9 millimeter handgun, which could not be linked to the Priester murder. The search of the store did not turn up anything of immediate evidential value.

Roberts admitted to the police that he and Priester had been engaged in a running dispute but insisted that at the time of the shooting he had been at Mason's Barber Shop (Mason's) several blocks from the M & M deli. Roberts supplied the names of several individuals, including employees of the shop, who could confirm his presence there. Roberts said he learned of the shooting at approximately 5:50 p.m. when a man he identified as Big D came into Mason's and said Priester had been shot. Roberts said that while he was at the barber shop, he placed and received several calls on his cell phone. He said that when he left Mason's, he went out drinking with several friends in Philadelphia.

While Roberts was in custody, he placed a telephone call to his fiancée, Kelly White. That call, in accordance with standard protocol, was monitored. Roberts told her, "They know everything, nothing is a secret. These people know from the time I came off the porch, they know the shit that went on this summer." He asked her to help track down people who could confirm his presence at the barber shop and to tell "Butter" that he needed money and an attorney.

On January 7, Lieutenant Pieslak of the Ewing police told Detective Holt that he had received a telephone call from a man who identified himself as Stanley Smith, who said the police had the wrong man in custody and that Roberts was not the shooter. The lieutenant told Holt the caller agreed to come to headquarters to give more information.

Police contacted the individuals that Roberts had identified as alibi witnesses, and they all confirmed that Roberts had been at Mason's when Priester was shot to death. They also described his clothing on that date, which did not accord with the description

given by Dickerson or the anonymous caller of the clothing worn by the shooter. The stories of these alibi witnesses, however, were inconsistent with respect to what Roberts had done after leaving the barber shop. Roberts, for instance, said he left the barber shop at approximately 8:00 p.m. with several friends, including Alphonso Wiggins. Wiggins, in contrast, said he left the barber shop alone at approximately 5:45 p.m. Trecia Taylor said she picked up Roberts at the barber shop sometime after 6:00 p.m. and that the two had gone to Philadelphia together and around 10:30 p.m. returned to her home to spend the night. Albert Barnes, on the other hand, said he picked up Roberts at the barber shop shortly after 6:00 p.m., and the two men, with other friends, went to Philadelphia, where they stayed until early the next morning.

On January 14, 2002, Holt applied for a communications data warrant to obtain the cell phone records of Roberts and Priester. In his affidavit in support of the warrant application, Holt referred to Dickerson's identification of Roberts as the shooter and his description of the shooter as wearing a black hat, black pants, black jacket, and a black ski mask. Holt noted in his affidavit Dickerson's statement that he had known Roberts for approximately ten years and that he was certain Roberts was the shooter. He also noted that Trecia Taylor had told Holt that she spoke to Roberts on his cell phone several times, once to tell him that Priester had been shot and that Roberts had responded that he already knew that because someone had walked into the barber shop to announce the killing.

Holt did not include in his affidavit that Dickerson had provided two earlier conflicting stories about the shooting. Nor did he include in his affidavit that individuals had confirmed Roberts's presence at the barber shop at the time of the shooting or that their description of Roberts's clothing that evening did not comport with the description provided either by Dickerson or the anonymous caller.

Based on that affidavit, the communications data warrant was issued, and the police obtained Roberts's telephone records on or about January 21. Holt was not actively working on the case when the records were received, however, because he went on paternity leave on January 18. Officers who reviewed the records in Holt's absence noted there were a number of calls between Roberts's cell phone and two other numbers in the time immediately before and after the shooting.

The warrant that had issued permitting the release of Roberts's cell phone information allowed the police to obtain subscriber information for the numbers contained in those records. Accordingly, the police faxed separate requests to the service providers for the subscriber information for those two numbers. The cover sheet for the request for one of the numbers simply referred to subscriber information. The service provider, however, supplied not only the subscriber information, which linked that number to defendant, but also forwarded erroneously to the police the toll billing information for that number. The cover sheet for the request for the second number asked for the toll billing information for that number, as well as the subscriber information. The service provider, on receipt of this request, forwarded not only the subscriber information, identifying the telephone number as assigned to Andre Bellinger, but the toll billing information as well. An examination of those telephone records showed an extensive number of phone calls between defendant and Bellinger on December 31, as well as calls with Roberts.

Defendant was arrested in early February on unrelated drug charges. Based on Lieutenant Pieslak having told Holt that he had received a phone call from someone who said he was Stanley Smith and that Roberts had not shot Priester, Holt (who had returned from paternity leave on February 6) arranged for defendant to be produced for an interview at the Mercer County Prosecutor's Office on February 11. In that interview, defendant told Holt that Roberts had been at the barber shop when Priester was shot and said that he had later accompanied Roberts for a

night of drinking. Detective Holt then asked defendant if he knew who Andre Bellinger was. Holt said defendant's eyes lit, that he looked startled, and said he wanted to consult with an attorney. The interview ended at that point.

On February 10, the day before Holt interviewed defendant, Khalif Johnson was arrested in Monmouth County on an unrelated charge of attempted murder. In connection with Johnson's arrest, a Smith and Wesson .357 magnum was recovered and sent for ballistics analysis. The results of that analysis, received several weeks later, determined the .357 magnum was the gun used to murder Priester.

Detective Holt wanted to find out what connection Bellinger had, if any, to the events in Trenton but was having trouble locating him. On February 16, Bellinger was arrested for a parole violation, and his parole officer notified Detective Holt. Holt interviewed Bellinger on February 17, in the presence of Bellinger's attorney. Bellinger originally said he spent December 31 in Long Branch but retreated from that position when advised that his phone records did not support his statement. Bellinger then said he went to Trenton on December 31 to sell some narcotics that he had been unable to market in his home territory in Long Branch. He said his friend Khalif Johnson drove him to Trenton and that Smith had led them to several locations in Trenton to make a drug deal, but his efforts were unsuccessful because of the poor quality of the goods. He said Khalif was not involved directly in the effort to sell the drugs in Trenton but had agreed to drive him to Trenton because he and Khalif had been best friends since they were five years old, had both been released recently from prison, and wanted to spend some time together. He said an unidentified man had been in defendant's car and had shot someone who was sitting in a car outside a deli.

Bellinger agreed to take a polygraph exam, which he failed. On February 21, Detective Holt interviewed him for a second time, again with his attorney present. Bellinger again recounted that Khalif Johnson drove him to Trenton so he could sell drugs and

that defendant took him to several potential purchasers. He said defendant had told him in phone conversations before the trip to Trenton that he and Roberts had a dispute with Priester, who was "stepping on their toes," and that he had, in turn, told Johnson of the feud. Bellinger said defendant went into more detail with respect to this dispute while they were together in Trenton. He said defendant told him that Roberts had been wounded by gunfire, and defendant and Roberts believed Priester was responsible.

Bellinger said that he and Johnson followed defendant as defendant led them to various potential sales areas. He said that another man, who he was unable to identify, was a passenger in defendant's car. Bellinger said that when his marketing efforts proved unsuccessful, defendant led them to Roberts's home. Bellinger and defendant went into the house, leaving Johnson and the other man outside. Bellinger said the three men discussed the ongoing dispute between Roberts and Smith on the one hand and Priester on the other, including their belief that Priester was responsible for the recent shooting incident in which Roberts had been wounded. They told Bellinger they wanted "some work put in" and asked if he were interested. He said he agreed, and they settled on a price of $2000. Roberts produced a new .357 magnum, still in its box, and gave it to Bellinger, who stuck it in his waist band. Bellinger said he went outside and outlined the matter to Johnson, who agreed to help. It was further agreed that after the shooting, defendant would lead Johnson and Bellinger, who were unfamiliar with the Trenton streets, to I–95 so they could return to Long Branch. In this second statement, Bellinger said they found Priester sitting in his car, that Bellinger ran up and fired the gun through the driver's window and ran back, leaving the gun in Smith's car. After Bellinger said that he shot Priester, Holt again spoke to Dickerson. Holt said Dickerson continued to maintain that he had seen Roberts shoot Priester.

Approximately two weeks later, on March 7, Detective Holt received a ballistics report indicating that the gun recovered in

connection with the arrest of Khalif Johnson in Asbury Park on February 10 was indeed the gun used to murder Priester. Holt thus learned that Bellinger's second statement, in which he said he left the gun in defendant's car, was not entirely truthful.

The following day, on March 8, Holt interviewed Bellinger a third time. Bellinger was again accompanied by his attorney. Holt pointed out to Bellinger that the recovery of the gun in Monmouth County demonstrated that Bellinger's statement was not completely accurate. After conferring with his attorney, Bellinger agreed to provide a complete account of what occurred on December 31. He again related the meeting between himself, Roberts, and defendant after he was unsuccessful in selling his drugs, the agreement to shoot Priester for $2000, and Roberts providing the gun. He again said that Johnson had agreed to help but in his third statement, Bellinger claimed that Johnson said he would shoot Priester rather than Bellinger because Johnson had more experience with guns. Bellinger said that he had taken responsibility for the shooting in his second statement because he knew that Johnson was facing a charge of attempted murder in Monmouth County, and he wanted to save his friend from spending too much time in prison. In this third statement, Bellinger said that three cars took off in search of Priester, one driven by Roberts, one driven by Smith, and one driven by Johnson. He said that as they drove around Trenton searching for Priester, he, defendant, and Roberts engaged in a number of phone calls, including several three-way calls.

During these calls, Bellinger continued, there was discussion of the fact that Roberts would be at the barber shop at the time of the shooting. At some point, it was decided it would be more efficient for Bellinger and Johnson to get in Smith's car as they looked for Priester. They eventually spotted Priester in the deli parking lot. Bellinger and Johnson returned to pick up Johnson's car, and Smith led them back to the deli. They parked the two cars a short distance from Priester. Bellinger said Johnson ran up, shot Priester, and got back into Johnson's car. Smith led the two out of Trenton to I-95. Bellinger said that Johnson told him

on the drive back to Long Branch that he would dispose of the gun.

Three days later, on March 11, Detective Holt interviewed Khalif Johnson at the Monmouth County Prosecutor's Office in connection with the Priester shooting. Holt outlined what his investigation had developed to that point, including that Bellinger had identified him as the shooter. Johnson said he wanted to speak with his father before proceeding, and arrangements were made for his father to come to the prosecutor's office. Johnson was given an opportunity to confer with his father and, after doing so, said he wanted to have an attorney present before answering any further questions.

The meeting ended at that point but resumed on March 26, with Johnson's attorney present. Johnson related the events of December 31 along the same lines as had Bellinger but said he was supposed to receive $3000 for his participation. He said he decided to shoot Priester because Bellinger had no prior experience in that field, and he was concerned that Bellinger would not be successful. He said he had disposed of the shell casings in a sewer drain and took the police to the site, but a search for the casings was unsuccessful. After completing his statement, Johnson selected defendant's picture from a photo array. The police obtained a search warrant for Johnson's car, and a search of the vehicle turned up a jacket that matched the description of the shooter's jacket that had been supplied by the anonymous caller, as well as a ski cap and skull cap.

Based on these statements, criminal complaints were prepared charging defendant with murder, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. These complaints were served on defendant on April 1, at which time defendant remained in custody on the unrelated charges for which he had been arrested in early February.

Robert Esposito occupied the cell next to defendant at the Central Assignment and Reception Facility, where they were both housed. Esposito testified that he knew defendant's brother

because the two had spent time together in a half-way house in Trenton and that he and defendant spoke regularly while they occupied adjoining cells. Esposito testified that defendant appeared not at all concerned after being served with these charges and described them with a barnyard epithet. According to Esposito, defendant said he was not concerned about the charges because he did not shoot anyone. Esposito said that over the next several days, defendant provided more details, saying that he gave a gun to a friend to shoot someone that defendant had a beef with and that defendant had been down the block when his friend shot the victim, who was sitting in a gray BMW. Defendant said the gun would not be traced because it was a revolver, which did not eject any shell casings.

On April 1, with his investigation basically completed, Holt, as the lead detective, reviewed the file to organize its contents. In doing so, he realized for the first time that the police had received the toll billing records for defendant's and Bellinger's cell phones without having sought and obtained an appropriate communications data warrant. He consulted with attorneys in the prosecutor's office, seeking advice as to how to proceed. He was told that he should prepare applications for communications data warrants for these phones, but to include within the supporting affidavit only information that he had as of the time the toll billing records had been received. Based on that advice, Holt prepared an affidavit that mirrored in large part the original affidavit he had submitted in support of his request for a communications data warrant for Roberts's cell phone, including in this affidavit Dickerson's statement that Roberts was the shooter. When Holt submitted this second affidavit, however, he knew, based on the statements of Bellinger and Johnson, that Roberts was in fact not the shooter. Based on this affidavit, communications data warrants were issued for both cell phone numbers.

## II.

Defendant and Roberts were both charged with murder for the death of Priester. Bellinger and Johnson each negotiated plea

bargains, under which they pled guilty to aggravated manslaughter and agreed to testify truthfully against defendant and Roberts. In return, the State agreed to recommend that Bellinger receive a sentence not to exceed twenty years, subject to *N.J.S.A.* 2C:43–7.2, and Johnson receive a sentence not to exceed twenty-five years, again subject to *N.J.S.A.* 2C:43–7.2.

Prior to the trial getting underway, Roberts and Smith both filed a motion to suppress the telephone records, based on the incomplete information supplied by Detective Holt in his first affidavit and the false information supplied in his second affidavit. After hearing Detective Holt's testimony, and the arguments of counsel, the trial court granted the motion.

The trial court concluded the first affidavit, with its omission of Dickerson's two prior untruthful statements, and its omission of any mention of Roberts's alibi witnesses, displayed a "reckless disregard for the truth." It further concluded that certain portions of the affidavit had to be excised as they were unsupported and that when the excised material contained in the affidavit was set aside, there was no probable cause for issuance of the warrant.

The trial court analyzed whether the information developed as a result of the police having obtained the phone records would be admissible nonetheless under the inevitable discovery doctrine and concluded it would not. It did determine, however, that the ballistics evidence, linking the gun recovered in Monmouth County to the Priester murder, and the statement of Robert Esposito were sufficiently independent of the phone records and would be admissible at trial.

Based on that ruling, the State sought and obtained from the Appellate Division leave to appeal. The appellate panel concluded, based on an interweaving of the inevitable discovery doctrine and the independent source rule, that the trial court had erred, and it reversed the order of suppression and remanded the matter for trial.

Shortly before the trial got underway, Roberts entered a negotiated plea of guilty to aggravated manslaughter in return for a sentence of ten years, subject to *N.J.S.A.* 2C:43–7.2. The State proceeded against defendant alone, and the witnesses against defendant included Bellinger, Johnson, Esposito, and Holt. He was found guilty of all charges and sentenced to thirty years in prison, subject to *N.J.S.A.* 2C:43–7.2. Defendant appealed, and a different panel of the Appellate Division affirmed, declining to address defendant's argument that the original panel had erred when it reversed the trial court's denial of the suppression motion. We granted defendant's petition for certification. *State v. Smith,* 205 *N.J.* 81, 12 *A.*3d 212 (2011).

## III.

Before this Court, defendant's arguments fall into two categories; the first relates to the issue of suppression, the second to defendant's claim of prosecutorial misconduct in connection with his trial. With respect to his suppression motion, defendant contends that the Appellate Division concluded incorrectly the telephone records and the information developed subsequently during the course of the investigation were admissible under the inevitable discovery doctrine and the independent source rule. He argues that the State was unable to prove by clear and convincing evidence that the police had sufficient probable cause to obtain a warrant for the phone records by the time it received those records. Similarly, he argues that the State has not proven that it would have sought a proper warrant for these records. He urges that as a consequence, Roberts's toll records should be suppressed, and his toll records, Bellinger's toll records, the statements of Bellinger and Johnson, and the ballistics evidence should all be suppressed as fruit of the poisonous tree.

Pointing to Holt's submission of a clearly false affidavit in April 2002, defendant argues in the alternative that this evidence is not admissible under the independent source doctrine because this

doctrine is only applicable in the absence of flagrant police misconduct.

The State counters these arguments by asserting that by the time it had received Roberts's phone records, the police had developed sufficient evidence apart from Dickerson's statement to permit it to obtain a warrant for those records. It also maintains that the actions of Detective Holt do not rise to a level of flagrant police misconduct. It stresses that if the telephone records of Roberts are not excluded, it clearly would have had probable cause to obtain the phone records of defendant and Bellinger. It also maintains that any error with respect to the admission of this evidence should fairly be characterized as harmless error. *R.* 2:10–2.

After this case was orally argued, we requested briefing on two additional questions: (1) whether, in the event we concluded that the phone records were inadmissible under either the inevitable discovery doctrine or the independent source rule, what remaining evidence would have been admissible at trial under *United States v. Ceccolini,* 435 *U.S.* 268, 98 *S.Ct.* 1054, 55 *L.Ed.*2d 268 (1978), and (2) could admission of the telephone records be deemed harmless error. In response to our request, defendant asserted that the connection between the telephone records and the witnesses who testified at trial was too close to come within the scope of *Ceccolini*'s attenuation analysis. Defendant also maintained that admission of the telephone records could not be considered harmless error.

The State, in contrast, asserted that excluding the telephone records at trial would not require barring the testimony of Bellinger and Johnson. It also contended that the telephone records played a relatively minor role at defendant's trial and that any error with respect to their admission was harmless under *Rule* 2:10–2.

Defendant rests his claim with respect to prosecutorial misconduct on four comments by the prosecutor in the course of his summation. We shall explore those statements in depth in the

course of our opinion, rather than burden the opinion with unnecessary repetition.

The State rejects the claim of prosecutorial misconduct, contending that the comments about which defendant complains were proper, and certain of them were responses to remarks made by defense counsel in his summation.

## IV.

We note first the standard governing our review of these contentions. When reviewing a claim with respect to an issue of suppression, a reviewing court must accept the factual findings made by the trial court in analyzing the question, provided those factual findings are "supported by sufficient credible evidence in the record." *State v. Handy*, 206 *N.J.* 39, 44, 18 *A.*3d 179 (2011). In considering the legal conclusions to be drawn from those facts, our review is de novo. *Id.* at 45, 18 *A.*3d 179 (citing *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995)).

When an appellate court reviews a claim of prosecutorial misconduct with respect to remarks in summation, the issue presented is one of law. Again, our review is plenary and de novo. *Manalapan Realty, supra*, 140 *N.J.* at 378, 658 *A.*2d 1230.

## V.

Both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution declare the peoples' right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The New Jersey Constitution directs that a warrant authorizing the police to conduct a search may not issue "except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized." *N.J. Const.* art. I, ¶ 7.

■ When a court receives an application from the police for a search warrant, it should not issue that warrant "unless the court is satisfied that there is 'probable cause to believe that ... evidence of a crime is at the place sought to be searched.'" *State v. Marshall,* 199 *N.J.* 602, 610, 974 *A.*2d 1038 (2009) (quoting *State v. Sullivan,* 169 *N.J.* 204, 210, 777 *A.*2d 60 (2001)).

■ Although "the probable cause standard is not susceptible of precise definition," a "principal component ... 'is a well-grounded suspicion.'" *State v. Moore,* 181 *N.J.* 40, 45, 853 *A.*2d 903 (2004) (quoting *State v. Nishina,* 175 *N.J.* 502, 515, 816 *A.*2d 153 (2003)). Probable cause "'means less than legal evidence necessary to convict though more than mere naked suspicion.'" *State v. Sullivan,* 169 *N.J.* 204, 210–11, 777 *A.*2d 60 (2001) (quoting *State v. Mark,* 46 *N.J.* 262, 271, 216 *A.*2d 377 (1966)). Probable cause exists when, considering "the totality of the circumstances," a person of "reasonable caution" would be justified in believing that evidence of a crime exists in a certain location. *Schneider v. Simonini,* 163 *N.J.* 336, 361, 749 *A.*2d 336 (2000).

■ The general remedy for police seizure of evidence in disregard of the warrant requirement is suppression of the evidence obtained improperly. *Handy, supra,* 206 *N.J.* at 45, 18 *A.*3d 179. The evidence obtained improperly is excluded so as not to reward misconduct and to provide an incentive for adherence to constitutional mandates.

> The purpose of the exclusionary rule is to act as a "deterrent safeguard to ensure that the Fourth Amendment is not reduced to 'a form of words.'" "[T]he 'prime purpose' of the rule, if not the sole one, 'is to deter future unlawful police conduct.'" ("The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.") Other than deterrence, the exclusionary rule advances the "imperative of judicial integrity" and removes the profit motive from "lawless behavior."
>
> [*State v. Evers,* 175 *N.J.* 355, 376, 815 *A.*2d 432 (2003) (citations omitted).]

■ Under the exclusionary rule, "the prosecution is not to be put in a better position than it would have been in if no illegality had transpired." *Nix v. Williams,* 467 *U.S.* 431, 443, 104 *S.Ct.*

2501, 2508, 81 *L.Ed.*2d 377, 387 (1984). The exclusionary rule is not monolithic and inexorable, however. Case law has developed certain exceptions to the exclusionary rule, in recognition of the fact that if exclusion in a particular instance will not further purposes of the exclusionary rule, there is no reason for the courts to apply it. *Id.* at 443, 104 *S.Ct.* at 2508, 81 *L.Ed.*2d at 387 (recognizing that the prosecution should not be in worse position "because of some earlier police error or misconduct"). In this appeal, we must consider two exceptions to the exclusionary rule that bear a facial similarity but have different conceptual bases, the inevitable discovery exception and the independent source rule.

### A.

The leading case in New Jersey on the inevitable discovery doctrine is *State v. Sugar,* 108 *N.J.* 151, 527 *A.*2d 1377 (1987). This Court considered issues related to the prosecution of the defendant on three separate occasions, *State v. Sugar,* 84 *N.J.* 1, 417 *A.*2d 474 (1980) (*Sugar I* ); *State v. Sugar,* 100 *N.J.* 214, 495 *A.*2d 90 (1985) (*Sugar II* ); and *State v. Sugar,* 108 *N.J.* 151, 527 *A.*2d 1377 (1987) (*Sugar III* ). Although the Court's opinion in *Sugar I* dealt with a violation of the defendant's Sixth Amendment right to a confidential relationship with his attorney, as opposed to the Fourth Amendment issue dealt with in *Sugar II* and *III,* the facts of *Sugar I* form an essential backdrop to the later analysis.

The defendant Sugar filed a missing persons report with respect to his wife on July 10, 1979. *Sugar II, supra,* 100 *N.J.* at 220, 495 *A.*2d 90. The defendant appeared to cooperate with the police in the search for his wife, providing leads and giving several interviews to the police. *Id.* at 220–21, 495 *A.*2d 90. He also permitted them to search his house and grounds on July 31. *Id.* at 221, 495 *A.*2d 90. During that search, the police observed that one portion of his yard appeared slightly depressed, with soft earth covering it. *Ibid.* They did not immediately explore that site. *Ibid.* On August 2 and 3, the defendant told the police he was going to

California for a few days and left a telephone number at which he could be contacted. *Id.* at 222, 495 *A.*2d 90. He said he did so because he did not want to create the impression that he was fleeing. *Ibid.* On August 6, 1979, the police returned to the property, in the defendant's absence, dug up that portion of the defendant's backyard, and found Mrs. Sugar's body. *Id.* at 223, 495 *A.*2d 90.

Shortly after midnight on August 7, 1979, the defendant was arrested as a material witness to his wife's homicide. *Sugar I*, *supra*, 84 *N.J.* at 5, 417 *A.*2d 474. He asked immediately to confer with his attorney, who, in light of the late hour, sent his associate. *Ibid.* When that attorney arrived, the two were placed in a conference room equipped with listening equipment. *Ibid.* The police, unbeknownst to the defendant, activated the equipment and listened to the defendant's conversation with his attorney. *Id.* at 6, 417 *A.*2d 474. The following day, the attorney and his associate returned and were again placed in the same conference room. *Ibid.* Again the police activated the equipment, listening to and taping some portions of the conversation. *Ibid.* Reports of these conversations were published in the local press. *Id.* at 9, 417 *A.*2d 474.

When this intrusion eventually came to light, the Attorney General's office superseded the prosecutor's office, and defense counsel sought relief from the trial court for the gross violation of the attorney-client relationship. *Id.* at 8–9, 417 *A.*2d 474. The trial court ordered the charges dismissed and enjoined the State from any further prosecution of the defendant for the death of his wife. *Id.* at 9–10, 417 *A.*2d 474.

This Court granted the State's petition for certification. Although equally outraged at the illegal conduct of the police, we held that the relief granted by the trial court was unwarranted. *Id.* at 11–12, 417 *A.*2d 474. After reviewing carefully the record, this Court concluded that the intercepted conversations had not revealed matters of trial strategy and that a complete removal from the prosecution of all those in any way involved in the

surreptitious eavesdropping would provide a sufficient protection for the defendant, and we remanded the matter. *Id.* at 26–27, 417 *A.*2d 474.

The defendant was then tried and convicted. *Sugar II, supra,* 100 *N.J.* at 219–20, 495 *A.*2d 90. On appeal, he contended that the trial court had denied improperly his motion to suppress the discovery of his wife's body. *Id.* at 232, 495 *A.*2d 90. This Court agreed that the record before it did not support the State's position that the defendant had consented to the police entry on his property, *id.* at 232–35, 495 *A.*2d 90, but we remanded the matter to the trial court to consider whether her remains would have been discovered inevitably. *Id.* at 240, 495 *A.*2d 90.[1] In connection with that remand, the Court laid out the elements of the inevitable discovery exception to the exclusionary rule.

> We require the State to show that (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [*Id.* at 238, 495 *A.*2d 90 (citations omitted).]

In addition, we directed that the State demonstrate these elements by clear and convincing evidence. *Id.* at 240, 495 *A.*2d 90.

On remand, the trial court concluded that the defendant's motion to suppress should be granted because the State had not sustained its burden to prove that the police would inevitably have discovered her body. The State again appealed, and this Court again reversed, in *Sugar III,* after concluding that the trial court had applied improperly the elements of the doctrine of inevitable discovery. *Sugar III, supra,* 108 *N.J.* at 158–59, 527 *A.*2d 1377.

Although we noted that the State must prove all three elements of the inevitable discovery exception by clear and convincing

---

[1] We also reversed defendant's conviction on an unrelated basis, that the trial court had permitted improperly one of the officers involved in the improper eavesdropping to appear as a witness.

evidence, we clarified that the State did not have to prove clearly and convincingly "under what precise circumstances the body would have been inevitably discovered." *Id.* at 158, 527 *A.*2d 1377. We explained that "[t]o establish the inevitability of discovery of evidence, the State need not demonstrate the exact circumstances of the evidence's discovery [nor] the exclusive path leading to the discovery." *Ibid.* Rather, we explained that the State only had "to persuade the court, by a clear and convincing standard, that the body would be discovered." *Ibid.* We noted that the State was not as constricted in its proofs as the trial court had considered. *Id.* at 158–59, 527 *A.*2d 1377. We observed that

[a] number of possibilities may cumulatively constitute clear and convincing evidence that the evidence would be discovered. The State need only present facts or elements—proving each such fact or element by a preponderance of the evidence—that in combination clearly and convincingly establish the ultimate fact and lead to the conclusion that the evidence would be inevitably discovered.

[*Id.* at 159, 527 *A.*2d 1377.]

In our opinion, we cited to a number of factors to support our conclusion that the police inevitably would have discovered Mrs. Sugar's body. We noted that the body lay in a shallow grave, close to the house, and "would have given off a detectable odor that would be noticeable by persons and would strongly attract animals and insects." *Id.* at 157, 527 *A.*2d 1377. We noted also that the defendant had contracted to sell the property and that the purchasers, who had a dog, testified they planned to work in that portion of the yard. *Id.* at 158, 527 *A.*2d 1377. We observed that the site where the body was buried "would soon begin to appear conspicuously different from surrounding property; it would be obvious to anyone that the site was abnormal, arousing suspicion." *Id.* at 161, 527 *A.*2d 1377. The combination of all of those factors demonstrated clearly and convincingly that Mrs. Sugar's body would have been discovered inevitably even in the absence of the police intruding improperly onto the property.

Two other reported New Jersey opinions have invoked the inevitable discovery doctrine. *State v. Finesmith,* 406 *N.J.Super.* 510, 968 *A.*2d 715 (App.Div.2009) (defendant's laptop admissible

even though police learned its precise location by questioning defendant in violation of *Miranda* because police would have inevitably found it); *State v. Damplias,* 282 *N.J.Super.* 471, 660 *A.*2d 570 (App.Div.1995) (bloody blanket seized while executing search warrant for pillows admissible under inevitable discovery doctrine).

The trial court in this matter concluded that the State had failed to establish the three elements of the doctrine of inevitable discovery, in particular, that it would have obtained the telephone records of defendant and Bellinger through its normal investigative procedures. We agree with this evidentiary conclusion of the trial court—standing by itself, the doctrine of inevitable discovery provides no basis to admit the telephone records of defendant and Bellinger.

Absent the telephone records of Roberts, Bellinger, and defendant, the police had no basis to conceive of a link between the three men, and certainly not a link between Bellinger and the murder of Priester. There was no evidential path leading from Trenton to Long Branch in the absence of those records.

B.

We turn then to a second principal exception to the exclusionary rule, the independent source rule.

This Court most recently discussed the independent source exception to the exclusionary rule in *State v. Holland,* 176 *N.J.* 344, 823 *A.*2d 38 (2003). In *Holland,* a member of the Glassboro police force was dispatched to assist an ambulance crew at a duplex residence. *Id.* at 349, 823 *A.*2d 38. The officer noted a strong odor of burnt marijuana and, after the departure of the ambulance, radioed for assistance to determine the source of that odor. *Ibid.* Three other officers arrived and concluded that the odor was coming from the adjoining residence of the duplex. *Ibid.* They knocked on the door and announced their presence, and one officer, stationed in the rear, stopped the defendant who, while

leaving by the back door, dropped a small quantity of marijuana. *Id.* at 350, 823 *A.*2d 38. The police then entered the residence and explored it fully, from the top floor to the basement, finding quantities of marijuana and drug paraphernalia along the way, together with facilities to grow the plant. *Ibid.* After completing their exploration, they summoned a detective and advised him of their discoveries, and he proceeded to seek a search warrant. *Id.* at 351, 823 *A.*2d 38.

The defendant thereafter moved to suppress the evidence that was seized when the search warrant was executed. *Ibid.* The trial court denied the motion, and the defendant was convicted subsequently at trial. *Ibid.* The Appellate Division reversed the denial of the motion to suppress but remanded the matter to the trial court for a determination of whether the improperly seized evidence was admissible under the independent source rule. *Id.* at 352, 823 *A.*2d 38. On remand, the trial court again denied the motion to suppress, a result the Appellate Division affirmed. This Court, however, reversed. *Id.* at 353, 823 *A.*2d 38.

We noted that the independent source rule had deep roots in our State's jurisprudence, *id.* at 354–55, 823 *A.*2d 38, and synthesized the following principles as the three-pronged framework to govern proper application of the rule. *Id.* at 360–61, 823 *A.*2d 38. If the State invokes the independent source rule to justify the use of evidence that has come into its possession through police error or misconduct, it must demonstrate three elements. These include that the State had probable cause to conduct the search at issue "without the unlawfully obtained information." *Id.* at 360, 823 *A.*2d 38. Thus, the State cannot use what it obtained through the improper search to bootstrap the existence of probable cause to justify the search. Additionally, the State must demonstrate, again "without the tainted knowledge or evidence," that it would have sought a proper warrant. *Id.* at 361, 823 *A.*2d 38. Further, it "must demonstrate ... that the initial impermissible search was not the product of flagrant police misconduct." *Ibid.* Finally, as

with the doctrine of inevitable discovery, it must establish all three elements by clear and convincing evidence. *Ibid.*

In insisting on this heightened level of proof, we drew on our opinion in *Sugar II, supra,* in which we found that a clear and convincing evidentiary burden was needed to assure the State would be "in no better position than it would have enjoyed had no illegality occurred." *Sugar II, supra,* 100 *N.J.* at 239–40, 495 *A.*2d 90.

In *Holland,* we noted the need to "apply scrupulously each part of the test, and that the government's failure to satisfy any one prong of the standard will result in suppression of the challenged evidence." *Holland, supra,* 176 *N.J.* at 363, 823 *A.*2d 38. We then applied that standard to the unchallenged record and concluded that the State had failed to demonstrate that "the information acquired by the officers wholly apart from the impermissible search would have prompted them to secure a warrant." *Id.* at 364, 823 *A.*2d 38.

In applying the principles we enunciated in *Holland* to the record before us, we deem it significant that in adopting the clear and convincing standard from *Sugar II,* we in no way retreated from the explication of that standard set forth in *Sugar III,* that is, that "[t]he State need only present facts or elements—proving each such fact or element by a preponderance of the evidence—that in combination clearly and convincingly establish the ultimate fact...." *Sugar III, supra,* 108 *N.J.* at 159, 527 *A.*2d 1377.

We turn then to the question whether the State did establish, by clear and convincing evidence, that it had sufficient probable cause to obtain these telephone records without regard to the improperly-obtained information they gleaned from reviewing those records. That inquiry, in turn, requires consideration of whether it would have obtained those records in the ordinary course, and whether it originally obtained the tainted information through flagrant police misconduct. In analyzing these questions, it is important to recognize that we are dealing with three separate

sets of telephone records: those of Roberts, obtained through Holt's deficient affidavit; those of defendant, obtained through an error on the part of his service provider; and those of Bellinger, obtained as a result of error both on the part of the police and his service provider.

The initial question is whether the record supports a finding that the police would have, through a source independent of Holt's defective affidavit, sought and obtained Roberts's telephone records. We are satisfied that it does. We previously laid out in chronological detail the manner in which this investigation unfolded. That record permits us to isolate what the police knew and when they learned it.

Although Holt prepared and submitted his affidavit seeking Roberts's telephone records on January 14, the trial court found the records were not received until at least January 21. By that date, the police knew that serious discrepancies existed with respect to the information provided by Roberts's alibi witnesses. They also knew that several of those alibi witnesses said they had spoken to Roberts on his cell phone while he was at the barber shop. We are satisfied that those discrepancies, which were significant both in terms of their nature and their quantity, when combined with the knowledge of the ongoing, violent dispute between Roberts and Priester, would have permitted the police to demonstrate the existence of probable cause for an examination of Roberts's telephone records, entirely untainted by the initially deficient affidavit.

Further, normal police investigative procedures would have led them to seek a communications data warrant to review Roberts's telephone records to determine if they could lend support to Roberts's alibi or indicate that it might be concocted. That they would have sought such a warrant as part of their normal investigation is indicated by the fact that they did, in fact, seek such a warrant, even though the application itself was flawed.

 A separate analysis is required with respect to the telephone records of defendant and Bellinger. That issue is resolved by the arrest of Khalif Johnson on February 10, which led to the identification of the murder weapon. That discovery, which was wholly independent of the telephone records, led the police to Johnson and, in turn, to Bellinger and then to defendant. The statements of Johnson and Bellinger, who each recounted the many phone conversations that occurred as they traveled through Trenton in search of Priester, would have supplied sufficient probable cause to permit the police to obtain warrants for release of the toll billing information for these phones. Those phone records would have been an integral part of any investigation to determine whether Johnson and Bellinger were being truthful in their statements.

Both Johnson and Bellinger, moreover, had an incentive to cooperate with the State and negotiate a favorable plea bargain. Both were involved in the commission of a homicide for money, an offense which at the time was a capital offense. *N.J.S.A.* 2C:11–3c (deleted by amendment, *L.* 2007, *c.* 204).[2]

The only way either man could extricate himself from the spectre of capital punishment was to agree to provide full details of the incident in return for a lesser charge. Further evidence of Johnson's incentive to cooperate and to tell the police what had occurred is also found in Johnson's trial testimony that when he conferred with his father, his father's advice to him was to tell the truth. Johnson was, in addition, facing charges of attempted murder in Monmouth County.

Bellinger had an equally strong incentive to provide a full account of the shooting to achieve a favorable plea bargain. He also faced a capital charge of murder for hire. Although he indicated initially a desire to shield Johnson and accept responsibility for the killing, that desire evaporated when he was confront-

---

[2] The offense is now subject to a mandatory life sentence, without the possibility of parole. *N.J.S.A.* 2C:11–3b(4)(d).

ed with proof that his earlier statements had not been truthful. Both men, moreover, were represented by counsel, who had an obligation to achieve the best outcomes for their clients, consonant with the truth.

The statements of Johnson and Bellinger, obtained by the police after the murder weapon was identified, would have provided ample probable cause for the phone records of Roberts and defendant so that the officers could learn if they contained corroboration for those statements.

We turn then to the final element of the independent source rule, that the "initial impermissible search was not the product of flagrant police misconduct." *Holland, supra,* 176 *N.J.* at 361, 823 *A.*2d 38. We reject defendant's contention that the State may not invoke the independent source rule because the trial court, in granting the motion to suppress, characterized Holt's supporting affidavit as demonstrating a reckless disregard for the truth. We do so for several reasons.

We note, for instance, that it was defendant's telephone records that contained the most direct link. The trial court found no misconduct on the part of the police in their procurement of these records. It held that the police came into possession of these records as a result of an error on the part of the service provider, and it specifically refused to hold that error against the State.

We note also that the criticisms the trial court leveled against Holt's initial affidavit dealt with matters of omission, as opposed to affirmative misstatements, which is a distinction that other courts have recognized when considering challenges to the accuracy of an affidavit submitted in support of a warrant. " '[A]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.' " *United States v. Mandell,* 710 *F.Supp.*2d 368, 373 (S.D.N.Y.2010) (quoting *United States v. Colkley,* 899 *F.*2d 297, 300–01 (4th Cir.1990)). "There is no requirement that a warrant affidavit fully describe all steps taken, all information obtained, and all statements made by

witnesses during the course of an investigation." *People v. Kerst,* 181 *P.*3d 1167, 1171 (Colo.2008).

The core issue presented in the context of a challenge to an affidavit, where the challenger alleges the affidavit is fatally inaccurate by reason of omission, is whether the information omitted from the affidavit is material. The test for materiality is whether inclusion of the omitted information would defeat a finding of probable cause; it is not, as the trial court formulated it here, whether a reviewing magistrate would want to know the information. *United States v. McIntyre,* 646 *F.*3d 1107, 1113–14 (8th Cir.2011); *United States v. Nelson,* 450 *F.*3d 1201, 1213–14 (10th Cir.2006); *United States v. Reivich,* 793 *F.*2d 957, 961 (8th Cir.1986); *Kerst, supra,* 181 *P.*3d at 1171; *State v. Bergin,* 214 *Conn.* 657, 574 *A.*2d 164, 169–70 (1990); *State v. Burnside,* 115 *Idaho* 882, 771 *P.*2d 546, 548 (Idaho Ct.App.1989); *State v. Holzer,* 656 *N.W.*2d 686, 689 (N.D.2003). *See generally,* Wayne R. La-Fave, *Search and Seizure,* § 4.4, n. 58 (4th ed. 2004) (collecting cases).

Our analysis of this issue is framed necessarily by the trial court opinion when it decided the motion to suppress. In its opinion, the trial court described the omission of the fact that Dickerson gave two earlier statements before he identified Roberts as the shooter as only demonstrating a reckless disregard for the truth. It did not determine that that omission defeated a finding of probable cause. Thus, rather than including the omitted information to determine its effect on the existence of probable cause, the trial court stated categorically that that entire portion of the affidavit should be excised. That, as we have noted, is not the proper test.

The fact that Dickerson may have provided earlier statements to Holt, in addition to the information Holt included ultimately in his affidavit is not, by itself, sufficient to defeat a conclusion of probable cause. Rather, Dickerson's omitted statements must be inserted into the affidavit Holt prepared and submitted and an assessment must be made, whether, in that expanded format, the

affidavit established probable cause. That assessment, moreover, must take into account the totality of the circumstances. *Colkley, supra,* 899 *F.*2d at 301–02 (citing *Illinois v. Gates,* 462 *U.S.* 213, 103 *S.Ct.* 2317, 76 *L.Ed.*2d 527 (1983)).

We decline, for several reasons, to remand this matter to the trial court to make this assessment. This matter has had an extensive procedural history; we are dealing with a crime that occurred more than ten years ago. The judge who handled this matter, from the initial pretrial motions through to verdict and sentencing, has since retired. The question presented, moreover, is one of law. It is thus appropriate, as it was in *Sugar III, supra,* 108 *N.J.* at 159–60, 527 *A.*2d 1377, that this Court apply the proper test and determine whether Holt's affidavit establishes probable cause when Dickerson's two earlier statements are added to the information already included.

When we apply that test, we conclude that probable cause for the issuance of this warrant still is present. The omitted statements, for instance, did not identify someone other than Roberts as the shooter. The second omitted statement, moreover, included the key detail of the silver-colored gun that had not been revealed publicly. Further, the record before us indicates that the only area of deception revealed by the polygraph results was the portion of Dickerson's second statement that he could not identify the shooter. An individual who has seen an act of violence during a dispute between individuals known to be involved in the drug trade may be reluctant at first to provide a complete account of what he has witnessed. If this information had been included in Holt's affidavit, it would not have defeated a finding of probable cause.

In another segment of its opinion, the trial court indicated that it was "concerned" about the investigation the police undertook into the alibi Roberts provided. It noted the number of statements the police had obtained about his alibi. It did not include in this segment of its opinion, however, a characterization of the omission of this information as evidencing a reckless disregard for

the truth. Even if we were to conclude that the trial court had intended this characterization to apply to this omission, we are satisfied that applying the proper test—inclusion in the affidavit of what was omitted previously—does not defeat probable cause. Several of the alibi witnesses, for instance, said that they spoke to Roberts on his cell phone during the time period that he said he was at the barber shop. Including that information, together with the disparate stories the police received about Roberts's activities after supposedly leaving the barber shop, does not defeat a conclusion of probable cause.

Defendant insists, however, that Holt's submission of his second affidavit, which repeated the identification of Roberts as the shooter, clearly constitutes flagrant police misconduct. We note that the trial court made no such conclusion with respect to that second affidavit; its criticisms were aimed solely at the first affidavit.

Further, Holt sought the advice of the attorneys in charge of the matter on how to proceed. Clearly, things should have been handled differently. At the very least, counsel should have recognized the unique situation that was presented and reviewed the affidavit before it was submitted to the trial court. While the response Holt received from his attorneys may have been ill-advised, we are reluctant to characterize conduct taken pursuant to legal advice as flagrant police misconduct.

Finally, although the statement in Holt's second affidavit identifying Roberts as the shooter cannot be justified, there would not appear to be any link between that statement and release of the telephone records of defendant and Bellinger. Thus, despite the flaws evident in the warrant application process, the independent source rule still applies because no flagrant police misconduct occurred.

## C.

In sum, the question of suppression of the telephone records and the evidence developed from those records involves a two-step

analysis, involving both the inevitable discovery doctrine and the independent source rule. The independent source here is the murder weapon; once that was recovered, the police would, through their normal investigatory steps, have inevitably been led to Bellinger and to defendant.[3] The Appellate Division concluded correctly that the trial court should not have granted the motion to suppress.

Our conclusion in this regard makes it unnecessary to address the impact, if any, of *Ceccolini, supra,* and whether admission of this evidence could be considered harmless error.

## VI.

We turn now to defendant's claim of prosecutorial misconduct, which as we noted earlier, focuses on statements made in the course of the prosecution's summation to the jury. Before analyzing defendant's argument, we set forth the well-settled principles that guide our consideration of his contentions.

■ New Jersey courts have commented repeatedly on the special role filled by those entrusted with the responsibility to represent the State in criminal matters, observing that the pri-

---

[3] In response to the trial court's queries at the motion to suppress with respect to how the gun recovered in Monmouth County was linked to Priester's murder, the prosecutor responded:

> Your Honor, with that regard, there is—I forget what the name of the system is that the State police have. The bullets are entered into something that is like a fingerprint system, and routinely, after weapons are picked up in offenses, they are run through the system, and the State's position that was not addressed in the brief, is in that regard, that the match would have been made up because those tests are done routinely after weapons are confiscated during the course of a crime.

This statement reflects the National Crime Information Center (NCIC) system maintained by the FBI, one portion of which is the Gun File. FBI–Homepage, http://www.fbi.gov/ (last visited Aug. 30, 2012). In addition, the Bureau of Alcohol, Tobacco, Firearms and Explosives maintains a national database of the markings in bullets recovered from a crime scene. National Integrated Ballistic Information Network, http://www.nibin.gov/ (last visited Aug. 30, 2012).

mary duty of a prosecutor is not to obtain convictions but to see that justice is done. *State v. Daniels,* 182 *N.J.* 80, 96, 861 *A.*2d 808 (2004) (noting "prosecutor's overarching obligation always remains 'not to obtain convictions, but to see that justice is done' " (quoting *State v. Frost,* 158 *N.J.* 76, 82, 727 *A.*2d 1 (1999))); *State v. Zola,* 112 *N.J.* 384, 426, 548 *A.*2d 1022 (1988). "Those entrusted with the responsibility of representing the State at criminal prosecutions must never forget their fundamental obligation is not to convict but to see that justice is done. If fairness and justice are forgotten in the pursuit of a guilty verdict, the integrity and authority of our criminal justice system is challenged." *State v. Goode,* 278 *N.J.Super.* 85, 91–92, 650 *A.*2d 393 (App.Div.1994).

A prosecutor is nonetheless entitled to argue the merits of the State's case "graphically and forcefully," *State v. Feaster,* 156 *N.J.* 1, 58, 716 *A.*2d 395 (1998) (quoting *State v. Marquez,* 277 *N.J.Super.* 162, 171, 649 *A.*2d 114 (App.Div.1994)), and is not required to present those arguments as if he were addressing a lecture hall, *State v. Johnson,* 31 *N.J.* 489, 510–11, 158 *A.*2d 11 (1960). The duty of the prosecutor " 'is as much ... to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' " *Frost, supra,* 158 *N.J.* at 83, 727 *A.*2d 1 (quoting *State v. Farrell,* 61 *N.J.* 99, 105, 293 *A.*2d 176 (1972)). In fulfilling that two-pronged duty, prosecutors should be guided by the maxim that they "may strike hard blows, [but] not ... foul ones." *Feaster, supra,* 156 *N.J.* at 59, 716 *A.*2d 395 (quoting *Berger v. United States,* 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935)).

An appellate court, in reviewing the trial record to determine whether the conduct of the prosecutor exceeded these bounds, must consider several factors, including whether "timely and proper objections" were raised, *Frost, supra,* 158 *N.J.* at 83, 727 *A.*2d 1; whether the offending remarks "were withdrawn promptly," *ibid.;* and whether the trial court struck the remarks and provided appropriate instructions to the jury, *ibid.* Addition-

ally, an appellate court will consider whether the offending remarks were prompted by comments in the summation of defense counsel. *State v. R.B.*, 183 *N.J.* 308, 329–30, 873 *A.*2d 511 (2005); *State v. Wilson*, 128 *N.J.* 233, 241–42, 607 *A.*2d 1289 (1992); *State v. Williams*, 317 *N.J.Super.* 149, 721 *A.*2d 718 (App.Div.1998), *certif. denied*, 157 *N.J.* 647, 725 *A.*2d 1128 (1999). If, after completing such a review, it is apparent to the appellate court that the remarks were sufficiently egregious, a new trial is appropriate, even in the face of overwhelming evidence that a defendant may, in fact, be guilty. *Frost, supra*, 158 *N.J.* at 87, 727 *A.*2d 1 (noting overwhelming evidence was no justification to deprive defendant of constitutionally guaranteed right to fair trial). In contrast, if the prosecutorial remarks were not "so egregious that [they] deprived the defendant of a fair trial[,]" reversal is inappropriate. *Id.* at 83, 727 *A.*2d 1; *see State v. Ramseur*, 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987).

### A.

The first portion of the prosecutor's summation to which defendant objects dealt with the testimony of Khalif Johnson. We outlined earlier in our opinion Johnson's testimony, which clearly inculpated defendant and Roberts as the masterminds of the shooting. Defendant's attorney, in his summation, attempted to persuade the jury that it should reject Johnson's testimony.

.... He [Johnson] sat on the witness stand and said despite the fact, despite the fact that he pled guilty to attempted murder three weeks after this incident took place, with the murder weapon, his murder weapon, that his deal was not for murder. It was for aggravated manslaughter. His deal was not for the maximum for aggravated manslaughter, but for 25 years. And in his mind, the way his attorneys explained it to him, he was hoping that that sentence would be concurrent to the sentence he was doing on the separate murder. Concurrent, running at the same time. So not even close to the 25 years if, in fact, his attorney was correct. That's the deal. And even if he didn't get concurrent time, he got consecutive, what an unbelievable deal he worked out for himself simply by saying what Detective Holt wanted to hear, what he told him he wanted to hear, what he gave him he wanted to hear, and what Khalif Johnson regurgitated.

The prosecutor, in his summation, attempted to rebut these remarks and to convince the jury that Johnson was indeed a credible witness.

On cross-examination, it was inferred that perhaps there was a concurrent sentence being offered by the Mercer County Prosecutor's Office in return for the testimony of Khalif Johnson. And you recall, it was brought out that he was serving a 20-year sentence for the charge in Monmouth County. Showed him the plea agreement. The plea is for 25 years. There is no deal for a concurrent sentence. Mr. Johnson acknowledged that. That's a maximum of 45 years without parole. 45 years, ladies and gentlemen. A long, long time.

Johnson had not been sentenced for his involvement in this matter at the time of defendant's trial and when these remarks were made. Johnson appeared for sentencing on March 2, 2007, several months before the trial court heard argument on defendant's motion for a new trial.

Those sentencing proceedings were remarkably brief. The entire argument of the prosecutor (who was the same prosecutor who had tried the case against defendant) was the observation that Johnson "did meet all the requirements of cooperation as noted in the plea agreements. . . ." He did not attempt to address the question whether Johnson's sentence should run concurrently or consecutively with the Monmouth County sentence he was serving. Johnson's attorney urged the sentencing court that even though the plea agreement called for a sentence of twenty-five years, Johnson should receive a lesser sentence and asked the court to "consider 20 years with an 85 percent. We know that in running that concurrent with the Monmouth County sentencing . . . Mr. Johnson knows he's in jail for quite some time. He understands that."

The sentencing court proceeded to review the appropriate statutory aggravating and mitigating factors, *N.J.S.A.* 2C:44–1a1b, concluded it would "abide by the terms of the plea agreement," and sentenced defendant to twenty-five years in prison, subject to *N.J.S.A.* 2C:43–7.2. After noting the appropriate fines, penalties, and jail credits, the sentencing court asked Johnson if he understood the sentence that had been imposed, and Johnson replied that he did. The sentencing court then directed that Johnson's

sentence would "run concurrently and not consecutively with the defendant's present sentence."

Defendant points to this concurrent sentence and argues that the statements made by the prosecutor in his summation were made to mislead the jury about the sentencing exposure Johnson faced as a result of his guilty plea. The prosecutor insists that there was no deal reached with Johnson for a concurrent sentence when he entered his guilty plea and that his remarks in summation were entirely accurate.

The record before us on this issue consists of the transcript of Johnson's guilty plea, the plea form he executed at the time of his guilty plea, and the sentencing transcript. The transcript of Johnson's guilty plea and the executed plea form are, indeed, entirely silent with respect to the issue. They contain no mention of a promise of a concurrent sentence. From that record, we can perceive no basis to conclude that the prosecutor's remarks in summation constituted prosecutorial misconduct.

We are in no position, however, to assess whether defendant's attorney may be able to marshal additional evidential support for his position that there was an unspoken, but mutually understood, element to Johnson's plea negotiations, that he would receive a concurrent sentence. Defendant is thus not foreclosed from seeking post-conviction relief if such evidential support can be gathered.

### B.

Defendant also complains of comments the prosecutor made with respect to the testimony of Detective Holt. We have earlier noted in our opinion the problems with the two affidavits that Holt submitted to seek telephone records. Defense counsel in his summation commented on various portions of the detective's testimony, as well as his efforts to obtain phone records, and told the jury that Holt "basically misled the judge in order to pursue this theory that he had so that he could hopefully blow up the alibi witnesses."

The prosecutor responded in the following manner:

Now, the defense counsel would have you believe that there's something under-handed about him not investigating how those phone records were obtained. That's just not the case. He was proceeding with the evidence that was obtained, trying to further the investigation. There was nothing underhanded about it, and the records have, in fact, been ruled admissible for your consideration.

Defendant argues these comments were misleading in light of the trial court's description of the first affidavit Holt prepared as evidencing a reckless disregard for the truth. As a result, he contends that he is entitled to a new trial.

We do not agree. We note that defense counsel made no objection at the time, thus indicating he perceived no prejudice. *State v. Timmendequas*, 161 *N.J.* 515, 576, 737 *A.*2d 55 (1999), *cert. denied*, 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001).

Further, the prosecutor was entitled to respond to defense counsel's vigorous attack on Holt's credibility. Additionally, by the time of the prosecutor's remarks, an appellate panel had concluded that the phone records should be admitted at defendant's trial. We cannot perceive in these remarks a basis to reverse defendant's conviction.

## C.

Defendant's next complaint with respect to the prosecutor's summation is that it infringed improperly on defendant's Fifth Amendment right to remain silent. We set forth earlier in our opinion the circumstances under which Holt first interviewed defendant. In order to protect defendant against any unfair inferences the jury might draw from those circumstances, the trial court directed that there be no reference to the fact that Smith was in custody on unrelated charges at the time of the interview. It also directed that there could be no reference to the interview terminating because Smith said he wished to consult with an attorney.

In summation, the prosecutor made the following remarks:

> And before I forget, the defense counsel made much of the fact that [ ], the defendant, did not give a written statement. You can't force someone to give you a written statement. Who is the one that terminated the interview? The defendant terminated the interview. He was more than happy to talk about being with Jerome Roberts on New Year['] Eve. He was more happy to say Jerome Roberts was in Mason's Barber Shop.
>
> What happened when the name Andre Bellinger was brought up? His eyes got big. He looked like he was in shock.
>
> . . . .
>
> And it was at that point that the defendant decides to terminate the interview. His buddy, his partner, his friend, his partner in the drug trade, at that point, when Bellinger's name is brought up, it's over. He doesn't want to talk any more. Isn't that something? If I had been in Detective Patrick Holt's shoes, I would have gone and talked to Andre Bellinger, too, to see why his name would get that reaction.

We reject defendant's argument with respect to these comments. We note that the only objection was to the prosecutor's use of the term "shock" to describe defendant's reaction, to which the trial court responded properly that the jury would rely on its own recollection. Further, it was defense counsel, in his earlier summation, who told the jury that the interview ended when defendant said he wanted to consult with counsel.

### D.

 Defendant's final complaint with respect to the prosecutor's summation is that he made misleading comments to bolster improperly the credibility of Robert Esposito, who testified of his conversations with defendant when they occupied adjoining prison cells. In this portion of his summation, the prosecutor made the following statements:

> Now, the next witness is Robert Esposito. And defense counsel belittled Mr. Esposito. Now, the fact of the matter is the State did not drag Mr. Esposito here. He's living in another state. He didn't even have to be here if he didn't want to be here. He chose to come here and testify to tell the jury what he knew about this case.
>
> . . . .
>
> He has absolutely no interest in the outcome of this case whatsoever. He's living in another state, came here of his own free will, and again, the defense counsel called the State desperate.

We note that defense counsel, as with Johnson and Holt, made vigorous arguments to the jury as to why it should reject Esposito's testimony. While the trial court was correct when it noted, in response to defense counsel's subsequent argument, that the prosecution's statement, which implied that an out-of-state witness could not be compelled to appear, was not accurate, the trial court was also correct when it concluded that this statement was not so improper that defendant should receive a new trial.

This trial was hard fought on both sides. We have recognized that criminal trials provoke strong feelings and that "rhetorical excesses ... invariably attend litigation." *State v. Williams*, 113 *N.J.* 393, 456, 550 *A.*2d 1172 (1988). Such excesses, however, do not always justify reversing a jury's verdict. We have specifically rejected a per se rule. *Frost, supra,* 158 *N.J.* at 88, 727 *A.*2d 1. The trial court, moreover, clearly instructed the jury that the remarks made by the attorneys in their summations were not evidence, but argument. We presume the jury followed the court's instructions. *State v. Loftin,* 146 *N.J.* 295, 390, 680 *A.*2d 677 (1996).

## VII.

The remarks by our dissenting colleague necessitate a brief response. We have no disagreement with the dissent when it notes the necessity for the police to be truthful in affidavits that are submitted in support of applications for warrants. Nor do we disagree with the dissent's condemnation of attempts to deceive a judge in order to obtain a warrant. But those settled principles do not control the analysis of this complex matter.

Contrary to the views expressed in the dissent, we have not closed our eyes to police misconduct in order to uphold a murder conviction. Were we to do so, we would disregard our responsibility to apply the law fairly. We have done no more than to apply the equally settled principle that application of the exclusionary rule is not warranted if that application would not advance the

underlying purposes of the rule. *Nix v. Williams, supra*, 467 *U.S.* at 443, 104 *S.Ct.* at 2508, 81 *L.Ed.*2d at 387.

We do not justify the submission of an affidavit in support of a communications data warrant that the trial court described as exhibiting a reckless disregard for the truth. The legal issue that must be analyzed, however, is not whether that affidavit was prepared improperly but whether a warrant would properly have been issued if the information omitted from that affidavit had been supplied to the trial court. We have set forth in our opinion our reasons for concluding that it would. The dissent simply disagrees with our assessment in that regard.

The dissent, moreover, ignores the reasons why the police sought Roberts's phone records in the first instance. They were not looking to establish probable cause to arrest Roberts for they had already done so. Roberts was arrested on January 5, and the affidavit in support of the communications data warrant was not prepared until January 14. Rather, they were seeking to investigate the strength of the alibi that Roberts had put forth. The statements of the alibi witnesses were inconsistent in several respects and contained references to exchanges of telephone calls. A logical investigatory step would be to determine whether Roberts's telephone records supported these statements.

We disagree with the dissent's analysis of the independent source doctrine in the context of this case. The independent source in this matter is the recovery of the murder weapon in Monmouth County, with its linkage through ballistics testing to the murder of Robert Priester. That discovery, which led to Khalif Johnson and Andre Bellinger, was wholly independent of the examination of Roberts's telephone records.

The dissent is based in part on its view that each strand of the independent source doctrine must be separately established by clear and convincing evidence. It provides no reason why it disagrees with our conclusion that the approach this Court adopted in *Sugar III, supra*, that it is the final result that must be

established by clear and convincing evidence, rather than each component part, is applicable here.

The trial court concluded that because the error that led to the initial production of Smith's telephone records, which showed a clear linkage with Smith and Bellinger and Roberts, was committed by Smith's service provider, rather than by the police, that error should not be held against the State in analyzing whether those records should be suppressed. The dissent provides no authority for rejecting that conclusion.

The dissent draws conclusions with respect to the submission of the affidavit submitted in support of the application for a communications data warrant for the telephone records of Smith and Bellinger that were never drawn by the trial court. It characterizes the inclusion in that affidavit of Dickerson's identification of Roberts as the shooter as a false representation since, by the time of this affidavit, Johnson had confessed to shooting Priester. As we noted earlier, it is clear from the trial court's oral opinion that it reserved its conclusion of reckless disregard for the truth for the first affidavit, with its omission of relevant information. It did not similarly chastise the prosecution for its submission of the second affidavit. In light of the fact that the trial court did not hesitate to express its condemnation of the first affidavit, it is reasonable to infer that if it were similarly offended by the contents of the second affidavit, it would not have hesitated to say so in no uncertain terms.

The dissent dismisses our analysis with respect to the second affidavit, asserting that the trial court suppressed the telephone records of Smith and Bellinger as fruits of the first warrant. This, in the eyes of the dissent, made it unnecessary for the trial court to consider the second affidavit. Such a view does not detract from our conviction that the trial court would not have hesitated to excoriate the prosecution if it thought the second affidavit represented a purposeful attempt at deception.

The advice from the prosecutor's office with respect to how to prepare this second affidavit may have been ill-conceived, but

nothing within the record supports the dissent's characterization of this affidavit. Holt testified at the suppression hearing with respect to this affidavit and noted that the affidavit informed the court that the telephone records of Smith and Bellinger had originally been obtained incorrectly. It is only the dissent that finds this affidavit the product of purposeful deception.

The dissent has taken the trial court's description of one affidavit as exhibiting a reckless disregard for the truth and applied that description to an entirely different affidavit, prepared at a later date and for a different purpose, an affidavit, moreover, as to which the trial court made no complaints. From that, the dissent concludes there was flagrant police misconduct. Such a transformation is not supported by this record.

## VIII.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, dissenting.

Today's ruling affirms the admission of evidence procured in flagrant violation of the warrant requirement of the New Jersey Constitution. By not suppressing evidence unlawfully obtained by the police, the majority upholds this defendant's conviction. But it does so by reducing the exclusionary rule to an empty form of words.

Here, to secure a warrant for one suspect's telephone records, a detective presented a purposely deceptive affidavit, hiding material facts necessary for a Superior Court judge to make an informed finding of probable cause. During the course of the investigation, the police then acquired the telephone toll billing records of two other suspects (one of whom was defendant) without the warrant demanded by our State Constitution. All three sets of telephone records were then used illicitly to further the State's investigation. At the conclusion of the investigation, to gain cover for the telephone records that were not secured by a warrant, the detective in charge filed for an after-the-fact warrant. The application

for that warrant was based on material facts that the detective knew to be false.

The serial violations of our Constitution by law enforcement officials undermine respect for core values in our criminal justice system. One of those values is that the police must be truthful in warrant applications made to our courts. The majority's refusal to suppress the telephone records in this case renders the exclusionary rule an illusory remedy for violations of the Constitution's warrant requirement.

At stake here is not just the sanctity of individual rights promised under our State Constitution but also judicial integrity. One purpose of the exclusionary rule is to deter police misconduct by removing the incentive for violating constitutional rights in the most effective way possible—suppressing the ill-gotten gains. The other purpose is to uphold judicial integrity. There can be no justification for deceiving a judge into issuing a warrant for the seizure of evidence. Moreover, the admission of tainted evidence in our courtrooms will breed disrespect for our system of justice.

A conviction—even a murder conviction—should not stand when it is based on evidence acquired by law enforcement officers in violation of the Constitution they have sworn to uphold. Because the majority will not apply the exclusionary rule to the flagrant police misconduct in this case, I respectfully dissent.

## I.

The facts presented here come from a *Franks* hearing.[1] The primary purpose of the hearing was to determine whether the police made material misrepresentations and/or omissions in seeking communication data warrants from a Superior Court judge and, if so, whether the evidence gathered from those defective warrants needed to be suppressed. At the hearing, only one

---

[1] *See Franks v. Delaware,* 438 *U.S.* 154, 98 *S.Ct.* 2674, 57 *L.Ed.*2d 667 (1978).

witness testified, Detective Patrick Holt of the Ewing Township Police Department.

## A.

Robert Priester, a known drug dealer, was shot to death in his parked car outside a deli in Ewing Township on December 31, 2001. Detective Holt took charge of the murder investigation, and his prime suspect became Jerome Roberts, another drug dealer. Detective Holt learned that Priester and Roberts had been involved in a violent turf war over drug sales. However, Detective Holt had no one to implicate Roberts in Priester's shooting until Larry Dickerson stepped forward. After his arrest for shoplifting, on January 4, 2002, Dickerson volunteered to Detective Holt that he had witnessed the shooting, although Dickerson disavowed knowing the identity of the shooter.

From the very beginning, Dickerson provided information to Detective Holt that the detective knew to be untrue. Dickerson averred with absolute certainty that, from his parked car across the street, he watched an unknown man garbed in black clothing fire several rounds through the *front* windshield of Priester's vehicle, killing Priester. However, the forensic evidence clearly established that the shots were fired through the *side* window. Holt showed Dickerson a picture of the undamaged front windshield of Priester's car and told him, "I can't be sitting in here listening to [you] lying about what took place."

Dickerson then changed course, making a statement that coincided with the information that Detective Holt provided to him. Now Dickerson claimed that he saw an unknown black male shoot Priester through the car's side window. Because Holt doubted Dickerson's story about not knowing the identity of the shooter, Holt arranged for him to take a polygraph examination. The results of that examination indicated that Dickerson was untruthful in his denial about the shooter's identity.

Presented with the polygraph results, Dickerson gave his third version, this time naming Roberts—Holt's prime suspect—as the

shooter. Dickerson claimed that he had known Roberts for ten years. Holt reduced this last version to writing. After spending twelve hours in police custody, Dickerson was released on a shoplifting summons.

On January 5, 2002, Roberts was arrested for Priester's murder. Roberts maintained that he was in a barbershop when Priester was shot. Five witnesses interviewed by the police corroborated that account. Those witnesses also described Roberts as wearing clothes different from Dickerson's description of the killer's attire. A search of Roberts's car uncovered a gun, but it was not the murder weapon. On January 7, 2002, Detective Holt received a phone call from a person identifying himself as "Stanley Smith" who indicated that Roberts was not the shooter.

B.

On January 14, 2002, Detective Holt prepared an affidavit in support of a communications data warrant for Roberts's cellular phone records. According to Holt, he only included information in the affidavit that would persuade the judge to issue a warrant. He testified, "[M]y obligation is to put into the affidavit facts that tend to grant me ... the search warrant for the phone records." With the distorted view that he could act as a censor, Holt withheld from the Superior Court judge reviewing the warrant application vital information about Dickerson's veracity and Roberts's alibi.

Detective Holt did not include in this affidavit that Dickerson's first statement about the shooting was false and that Holt himself supplied Dickerson with the information that the shots were fired through the driver's side window. Holt did not include that Dickerson gave a second statement in which he denied knowing the identity of the killer. Holt did not include that Dickerson failed a polygraph test or that he was under arrest for shoplifting when he was questioned. Holt did not include that five witnesses corroborated Roberts's claim that he was at a barbershop at the time of the killing.

Holt kept the facts deceptively simple for the Superior Court judge. The affidavit stated that Dickerson saw Roberts walk towards Priester's car; that Roberts pulled a black ski mask over his face; that Roberts drew a nickel-plated gun and fired four to five shots through the driver's side window; "that [Dickerson] had a clear, unobstructed view of the shooting"; and "that [Dickerson] was one hundred percent sure [Roberts] was the shooter." Holt harbored "concern" about the reliability of Dickerson's final story, but he did not share any of his doubts—or any contradictory facts—with the Superior Court judge responsible for issuing the warrant.

Based on Detective Holt's misleading and deceptive affidavit, a Superior Court judge issued a warrant for Roberts's cellular phone records. On January 21, 2002, the police received Roberts's cellular phone records, which revealed that he had made numerous calls to two telephone numbers on the day of Priester's murder. For one telephone number—Andre Bellinger's—the police faxed a request to the service provider for both subscriber information and the telephone toll billing records. The police did not attempt to obtain a warrant before securing Bellinger's toll billing records, another clear violation of the warrant requirement. *See State v. Hunt*, 91 *N.J.* 338, 348, 450 *A.*2d 952 (1982).

For the other telephone number—defendant Stanley Smith's—the police faxed a request to the service provider for just subscriber information, but received in return not only defendant's subscriber information but also his telephone toll billing information. The police decided to capitalize on the provider's error. The police neither returned the toll records to which they were not entitled nor sought a warrant to legitimize their use of those records. Despite lacking judicially issued warrants for the toll billing records of both defendant and Bellinger, the police illicitly used those records in furtherance of their investigation.

The telephone toll billing records—all obtained in violation of the warrant requirement—led the police to question defendant and then Bellinger. Detective Holt's interview of defendant on

February 11 did not elicit any incriminating admissions. However, Detective Holt made progress during his interrogations of Bellinger in February and March with the use of the illicit toll billing records. At first, Bellinger confessed to shooting Priester himself and incriminated Roberts and defendant in the crime. However, the police learned that Bellinger's close friend, Khalif Johnson, had discarded a Smith and Wesson .357 handgun that ballistics tests eventually linked to Priester's murder. Confronted with that evidence, Bellinger eventually implicated Johnson as the shooter. Detective Holt later questioned Johnson, who confessed to shooting Priester at the behest of Roberts and defendant.

On April 1, 2002, with the investigation nearly complete and all of the suspects charged with Priester's murder, Detective Holt realized that he did not have judicial warrants to justify his possession of defendant and Bellinger's telephone toll billing records. He conferred with a Mercer County assistant prosecutor, and they decided to apply for a new communications data warrant legitimizing their seizure of those records.

At this point, they knew that Johnson—not Roberts—was the shooter. They knew that Dickerson's statement identifying Roberts as the shooter was a lie. They knew that Dickerson's account recited in Holt's earlier warrant affidavit was false. In his new affidavit, with the information now available, Detective Holt had the perfect opportunity to cleanse the record of the misrepresentations that he had passed along through his discredited informant, Dickerson. However, Holt did not lay bare the truth in his new affidavit in support of a communications data warrant. Instead, he averred again, under oath, to the same representations made in the first affidavit—representations he knew to be false. He presented Dickerson to be a truthful informant when he knew that Dickerson's account was a tissue of lies. On that basis, Holt secured the second communications data warrant from a Superior Court judge who placed trust in the presumed good faith representations set forth in the affidavit.

Notably, Holt testified at the hearing that the entire case against defendant, including "the identification of Bellinger as a possible witness or participant, and the identification of Khalif Johnson," developed from the "obtaining of Roberts's cell phone records."

## II.

### A.

At the conclusion of the *Franks* hearing, the trial court ruled that Detective Holt demonstrated a reckless disregard for the truth by withholding vital information from the warrant judge— information that undermined the veracity of Dickerson and exculpated Roberts. Accordingly, the court struck from Holt's initial affidavit those paragraphs that deceptively presented facts. After making those excisions, the court determined that there was insufficient evidence remaining in the affidavit to support the issuance of the communications data warrant. The court suppressed Roberts's cell phone records and all evidence secured through the exploitation of those tainted records. The suppressed evidence included defendant and Bellinger's cell phone records and Bellinger's written statement.[2] The murder weapon, which Johnson was observed discarding, was deemed "independent of any tainted evidence," provided the State could establish that the State Police would have linked the weapon to the Priester killing through ordinary investigatory protocols. The admissibility of Johnson's statement as independent, non-tainted evidence depended on the admissibility of the murder weapon. The court stated that it would allow two jailhouse informants to testify against defendant.

---

[2] Because the trial court suppressed defendant and Bellinger's cell phone records as the fruits of the first warrant procured by Holt's deceptive affidavit, it did not have to condemn Holt's later false affidavit in support of the issuance of the second warrant for those specific cell phone records.

The Appellate Division granted leave to appeal and reversed the suppression order. The panel found that "there [was] ample evidence to support the trial judge's conclusion that omissions from Detective Holt's January affidavit constituted a reckless disregard for the truth." However, the panel concluded that the police "would have obtained a valid warrant for Roberts's toll billing records through normal investigatory procedures, independent of the improper warrant application." On that basis, the panel held that all of the evidence suppressed by the trial court was "admissible under the independent source and inevitable discovery doctrines."

### B.

At trial, the cell phone records were admitted into evidence and played a central role in the prosecution of defendant. In his testimony, Detective Holt relied heavily on those records, detailing the phone calls between defendant, Roberts, and Bellinger on the day of Priester's murder. Detective Holt used a chart to describe to the jury how the phone calls aided his investigation and led to defendant's arrest. Both Bellinger and Johnson, who testified as the State's witnesses after cutting favorable plea deals, referenced the extensive phone communications among the co-conspirators on the day Johnson shot Priester.

The State exploited, to the fullest extent, the unlawfully secured phone records to make its case against defendant and to obtain a murder conviction against him. Although the Appellate Division affirmed the conviction, it nevertheless condemned the improper methods employed by Holt in his warrant applications for the toll records of Roberts, defendant, and Bellinger.

### III.

We granted certification to determine whether our jurisprudence compelled the suppression of the telephone records, as the trial court concluded.

A.

Article I, Paragraph 7 of the New Jersey Constitution protects not only our persons and homes, but also our "papers" and "effects" from "unreasonable searches and seizures." It also provides that "no warrant shall issue, except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the papers and things to be seized." *N.J. Const.* art. I, ¶ 7. "Our constitutional jurisprudence expresses a clear preference for government officials to obtain a warrant issued by a neutral and detached judicial officer before executing a search." *State v. Edmonds,* 211 *N.J.* 117, 129, 47 *A.*3d 737 (2012) (citing *State v. Frankel,* 179 *N.J.* 586, 597–98, 847 *A.*2d 561 (2004)). Searches conducted without a warrant are presumptively unreasonable under our Constitution. *See id.* at 129–30, 47 *A.*3d 737.

In New Jersey, persons have an expectation of privacy in their telephone toll billing records that is protected by Article I, Paragraph 7. *Hunt, supra,* 91 *N.J.* at 345–48, 450 *A.*2d 952.[3] Accordingly, police must first obtain judicial authorization—by a warrant or in some other form—before securing a person's toll billing records without the subscriber's permission. *See id.* at 348–50, 450 *A.*2d 952.

Generally, when the police seize evidence in violation of the warrant requirement, suppression of the evidence is the remedy. *State v. Holland,* 176 *N.J.* 344, 353, 823 *A.*2d 38 (2003) (citing *Mapp v. Ohio,* 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.*2d 1081 (1961)). Our jurisprudence does not countenance the securing of a warrant through duplicitous means. For that reason, a warrant is invalid (1) if a police officer makes "material misstatements in a search warrant affidavit" with knowledge of the falsity of those statements or with reckless disregard for the truth and (2) if excision of the untruthful statements would leave the affidavit without proba-

---

[3] Telephone toll billing records are afforded greater protection under the New Jersey Constitution than under the Fourth Amendment of the United States Constitution. *Id.* at 344–46, 823 *A.*2d 38.

ble cause for the issuance of the warrant. *State v. Howery,* 80 *N.J.* 563, 566–68, 404 *A.*2d 632 (1979); *see also Franks v. Delaware, supra,* 438 *U.S.* at 155, 98 *S.Ct.* at 2676, 57 *L.Ed.*2d at 672.

Under that test, the trial court in this case found that the police violated the warrant requirement. The court properly excised those portions of the affidavit that Holt cast in a false light. Thus, the court struck from Holt's affidavit his recitation of Dickerson's last account of the shooting that was in direct conflict with Dickerson's earlier accounts that Holt omitted from the affidavit.

Dickerson's first statement to Holt was that an unidentified black male fired shots through the front windshield of Priester's car. Holt showed Dickerson a picture indicating that the driver's side window, not the front windshield, was shattered. Not surprisingly, Dickerson in his second statement indicated that the unidentified shooter fired through the side window. Dickerson named Roberts—Holt's prime suspect—as the shooter only after the police told Dickerson a polygraph test indicated that he was untruthful in denying knowledge of the identity of the shooter. However, Holt conveyed to the warrant judge only that Dickerson stated that he had a "clear, unobstructed view of the shooting," that he observed four to five shots fired through the driver's side window, and that he "was one hundred percent sure [Roberts] was the shooter." Thus, the trial court's deletion of those paragraphs from the affidavit that related, at best, half-truths was appropriate.

But even if the proper approach were, as indicated by the majority, to add all the omitted information to the affidavit—all of Dickerson's conflicting statements and Roberts's alibi evidence— Dickerson's veracity would have been placed in such doubt that it is unlikely that an informed judge would have found probable cause. If Holt revealed the truth in his affidavit, the warrant judge would have learned that Holt showed Dickerson how the shooting occurred, and that Dickerson merely repeated that version in his third statement. The judge would have learned that Dickerson's basis of knowledge for a key fact about the murder

was the investigating detective. *See State v. Keyes,* 184 *N.J.* 541, 555–56, 878 *A.*2d 772 (2005) (holding that "[t]o determine an informant's basis of knowledge, the court must decide whether the tip reveals expressly or clearly how the informant became aware of the alleged criminal activity") (internal quotation marks omitted). If the full truth were revealed, the judge would have learned that not much weight could be given to Dickerson's veracity, for Dickerson failed a polygraph test and provided conflicting statements until he finally implicated the target of Holt's investigation. *See id.* at 555, 878 *A.*2d 772 (holding that in applying for a warrant, the police "must give the court an opportunity to make an independent evaluation of the informant's present veracity").

Suppression of evidence obtained in violation of the warrant requirement is in keeping with the purpose of the exclusionary rule. That purpose is two-fold—" 'to deter future unlawful police conduct' by denying the prosecution the spoils of constitutional violations" and to "advance[ ] the 'imperative of judicial integrity.' " *State v. Badessa,* 185 *N.J.* 303, 310–11, 885 *A.*2d 430 (2005) (quoting *State v. Evers,* 175 *N.J.* 355, 376, 815 *A.*2d 432 (2003)). Moreover, if evidence seized unlawfully leads police to other evidence, the exclusionary rule applies to the "later-derived evidence ... as 'fruit of the poisonous tree.' " *Holland, supra,* 176 *N.J.* at 353, 823 *A.*2d 38 (quoting *Nix v. Williams,* 467 *U.S.* 431, 442, 104 *S.Ct.* 2501, 2508, 81 *L.Ed.*2d 377, 386 (1984)).

## IV.

### A.

I agree with the majority that the State failed to establish the necessary elements for the application of the inevitable-discovery doctrine. *State v. Smith,* 212 *N.J.* 365, 392–94, 54 *A.*3d 772, 787–88 (2012). Accordingly, "[a]bsent the telephone records of Roberts, Bellinger, and defendant, the police had no basis to conceive of a link between the three men." *Id.* at 393, 54 *A.*3d at 788. I

disagree with the majority that, in light of the constitutionally defective warrant, the independent-source doctrine provided a path to the admission of the telephone records.

The independent-source doctrine is a limited exception to the general rule that evidence procured in violation of the warrant requirement requires suppression. *Holland, supra,* 176 *N.J.* at 354, 823 *A.*2d 38. Under this exception to the exclusionary rule, evidence that is " 'discovered by means wholly independent of any constitutional violation' " may be admitted into evidence. *Ibid.* (quoting *Nix supra,* 467 *U.S.* at 443, 104 *S.Ct.* at 2508, 81 *L.Ed.*2d at 387). In *Holland,* we established a "framework to be applied when evaluating the independent-source doctrine under Article I, paragraph 7 of the New Jersey Constitution." *Id.* at 360, 823 *A.*2d 38. The State must satisfy a three-prong test to show that evidence, otherwise subject to exclusion under Article I, Paragraph 7, would have been discovered through an independent source. *Id.* at 360–61, 823 *A.*2d 38. First, the State must demonstrate that it possessed sufficient independent evidence to establish probable cause for the issuance of a warrant for the telephone records. *See ibid.* Second, the State must demonstrate by clear and convincing evidence that "the police would have sought a warrant without the tainted knowledge or evidence" acquired by viewing the telephone records. *See ibid.* Third, the State must also demonstrate, by clear and convincing evidence, that "the initial impermissible [seizure of the telephone records] was not the product of flagrant police misconduct." *See ibid.* Significantly, "the government's failure to satisfy any one prong of the standard will result in suppression of the challenged evidence." *Id.* at 363, 823 *A.*2d 38.

## B.

Let us begin with prong three. The State cannot show by clear and convincing evidence that the acquisition of the telephone records of Roberts, Bellinger, and defendant "was not the product

of flagrant police misconduct." *See id.* at 361, 823 *A.*2d 38. In applying for a warrant, the police "must give the court an opportunity to make an independent evaluation of the informant's present veracity." *See Keyes, supra,* 184 *N.J.* at 555, 878 *A.*2d 772. Here, Detective Holt's expressed purpose for withholding information from his affidavit was to defeat the warrant judge's ability to independently assess Dickerson's veracity. Holt testified that his intention was to give the judge only the information that supported his application for a warrant. Holt knew that Dickerson's credibility was shaky based on three conflicting statements—one of which strongly established that Dickerson could not have seen the shooting. Dickerson's first statement that the fatal shots were fired through the front windshield was contradicted by irrefutable forensic evidence. But the only information that Holt shared with the warrant judge was that Dickerson claimed to have had a "clear, unobstructed view of the shooting" when he observed four to five shots fired through the driver's side window. Incredibly, Holt withheld from the warrant judge that Dickerson failed a polygraph examination. Moreover, Holt knew that five alibi witnesses placed Roberts at a place other than the shooting, and yet he did not provide that information to the warrant judge.

It is fair to conclude that Holt kept from the warrant judge material information because he feared that the unruly truth would interfere with his ability to secure a warrant. Holt omitted not peripheral data or extraneous background information, but rather material evidence necessary for an independent judicial officer to assess Dickerson's veracity.

Next, the police did not even bother to apply for a warrant to obtain Bellinger's telephone toll records. The police merely sent a fax requesting those records, and the telephone provider simply complied. Not even a half-hearted effort was made to comply with the warrant requirement in this instance.

In defendant's case, the police sent his telephone provider a request for subscriber information and, in return, received by mistake not only the subscriber information, but also defendant's

telephone toll billing records. The police knew that those records could only be acquired through a judicial warrant and that, without a warrant, they were in wrongful possession of those documents. Defendant had a constitutionally guaranteed expectation of privacy in his toll billing records, and the provider's misstep should not be a windfall to the State, allowing it to evade its obligation to comply with the warrant requirement. The police should have returned those records or applied for a warrant to justify their possession and use of them. The majority takes the position that the police could exploit the provider's mistake. By the majority's logic, the police are constitutionally free to open and inspect letters and packages addressed to a known person if, by chance, a mail carrier wrongly delivers the object to headquarters.

We know that the State believed that it was in wrongful possession of defendant and Bellinger's toll billing records because, after the investigation was completed, Holt applied for a communications data warrant for them. By that time, the records had been used not only to identify defendant, Bellinger, and Johnson, but also in the interrogation of the suspects. At this point, Holt was fully aware that Dickerson's account was a lie. Indeed, Johnson already had been found discarding the murder weapon and had admitted to shooting Priester. Nevertheless, after consulting with an assistant prosecutor, Holt submitted a second warrant affidavit in which, under oath, he presented again Dickerson's false claim that Roberts was the shooter. That an assistant prosecutor allowed Holt to present a false affidavit to the court does not minimize the wrongdoing, as the majority believes. The actions of both must be attributed to the State. Holt succeeded in obtaining the second communications data warrant by false representations, which is of overriding importance to the analysis of the misconduct here.

If these serial violations of the warrant requirement do not constitute flagrant police misconduct, it is difficult to imagine a set of facts that would. Our courts will have no faith in warrant applications unless the police have a powerful incentive to tell the

truth in their sworn affidavits. Judges cannot protect against unreasonable searches and seizures when the police purposely omit material information or provide false information that is intended to mislead them.

Law enforcement officers must walk square corners. They must speak truth to judicial officers. When those charged with enforcing the law secure evidence by foul means, the admission of that evidence in our courts undermines respect for the integrity of the judicial process. On this record, the State cannot show by clear and convincing evidence that the telephone records were not obtained by flagrant police misconduct.

## C.

The State also cannot satisfy prong two of the *Holland* test. It cannot show by clear and convincing evidence that it would have sought a warrant for the telephone records through a presentation of truthful evidence. In fact, the record shows just the opposite. As noted earlier, at the conclusion of the investigation, when given an opportunity to correct the first deceptive affidavit submitted to the court, Detective Holt instead repeated the same misleading statements in his second warrant application.

## V.

The independent-source doctrine is a limited exception to the exclusionary rule. By the terms we set forth in *Holland*, the independent-source doctrine does not apply to the facts here. The exclusionary rule was devised for the type of case that is now before us. The twin purposes of the exclusionary rule are to deter the police by removing the profit from engaging in unconstitutional activity and to uphold judicial integrity by denying the State the use of illicit spoils in court proceedings.

The record reveals egregious violations of our State Constitution. The deception of a judge charged with the responsibility of making a probable-cause determination before issuing a warrant is

a serious breach of trust. Such conduct must be deterred. I cannot join the majority because our exclusionary-rule jurisprudence commands the suppression of evidence unlawfully acquired in this case. Unlike the majority, I would reverse defendant's conviction—a conviction based on evidence procured in violation of our Constitution. I therefore respectfully dissent.

*For affirmance*—Justices LaVECCHIA, HOENS, PATTERSON, and Judge WEFING (temporarily assigned)—4.

*For reversal*—Chief Justice RABNER and Justice ALBIN—2.