NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0772-14T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

KAZMECK HOLLINGSWORTH,
a/k/a DARNELL DRAYTON, KAZ
HOLLINGSWORTH, DARNEL DRAYTON,
MARCUS N. FISHER, KAZMACK
HOLLINGSWORTH, KAZMECK
HOLLINSWORTH, KWAZEEK
FISHER, KWA-ZZEK FISHER,
and BIZZ,

 Defendant-Appellant.

________________________________________________________________

 Submitted February 7, 2017 – Decided August 18, 2017

 Before Judges Espinosa and Suter.

 On appeal from Superior Court of New Jersey,
 Law Division, Camden County, Indictment No.
 10-02-0648.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Gilbert G. Miller, Designated
 Counsel, on the brief).

 Mary Eva Colalillo, Camden County Prosecutor,
 attorney for respondent (Jason Magid,
 Assistant Prosecutor, of counsel and on the
 brief).
PER CURIAM

 In his appeal, defendant argues his convictions for

aggravated assault and weapons offenses should be reversed because

the trial judge erred in failing to grant a motion for a mistrial

and because prosecutorial misconduct deprived him of a fair trial.

He also argues the sentence imposed was manifestly excessive. We

affirm.

 I.

 The evidence relevant to defendant's arguments can be

summarized as follows.

 The victim, R.D., was shot several times at approximately

2:30 a.m. on June 28, 2009. Responding to a 911 call, Camden

Police Officer Craig Milbury found R.D. lying on the steps outside

an apartment, bleeding. R.D. told Officer Milbury he was in pain

and had been shot, but when asked, did not identify who had shot

him. He was transported to the hospital where he underwent

surgery. He later made a full recovery.

 D.M., the victim's aunt, lived on the second floor of one of

the apartments. She told Officer Milbury she did not see what

happened to R.D. D.M. later gave a taped statement in which she

stated she did not see what happened to R.D., but that he yelled

out to her that he had been shot by defendant and M.H.

 2 A-0772-14T2
 In statements to the police, D.M.'s daughter, Da.M., and

M.M., a friend of the victim, said they saw defendant had a gun

before R.D. was shot. They also both reported that M.H.,

defendant's cousin and the father of Da.M.'s child, was also

present at the time of the shooting. Da.M. told police she saw

defendant shoot R.D. However, she later wrote a letter to the

trial court recanting that statement, insisting she "really didn't

see everything that happened to [R.D.]."

 R.D. gave a taped statement to defense investigator Eric

Johnson in which he denied being shot by defendant.

 The investigation of the crime scene revealed two shell

casings near the curb of the street, blood on the sidewalk, and

two bloody t-shirts on the steps where R.D. was found. No gun was

recovered.

 At trial, D.M. testified she was inside her apartment when

she heard gunshots outside her open window. She looked out the

window and saw R.D. collapse on the steps outside her apartment,

bleeding and screaming to her that defendant and M.H. shot him.

She also saw defendant and M.H. walking away from R.D. after he

was shot.

 M.M. testified she was sitting on the stoop with R.D., Da.M.

and another friend when defendant, M.H. and a third unidentified

person approached. She was then asked to identify defendant in

 3 A-0772-14T2
the court room:

 Q. Okay. So let's start with
 [defendant], do you see him sitting
 here in the courtroom today?

 A. Yeah.

 Q. Okay. Could you describe what he's
 wearing?

 A. The khaki inmate suit.

 Defendant was not wearing an "inmate suit." He was wearing

a khaki-colored shirt and jeans.

 Defense counsel requested a sidebar conference and moved for

a mistrial. The trial judge did not explicitly deny the motion

but stated that, because defendant was "not wearing inmate

garments," the proper response would be

 to indicate to the witness that, given how
 she's described his shirt it appears to me
 she's described the defendant. I'm going to
 have him stand up and ask if that's who she's
 referring to. And the jury will see and I'll
 indicate on the record that he's not – we'll
 indicate what he's wearing.

 Defense counsel argued this response "just highlights the

problem," and asked that the trial move on without any curative

charge to the jury because it would be "ineffective." The trial

judge honored the request, and stated,

 I'll just make sure to let the record reflect
 the fact that the defendant is not wearing a
 khaki inmate suit, he's wearing blue pants.
 Some of the jurors can see his pants, some

 4 A-0772-14T2
 probably can't. They're blue. He has on a
 tan colored shirt, which is not a Camden
 County issue shirt.

 After the sidebar conference concluded, the trial judge

stated to the jury, "the witness has indicated the person wearing

the khaki colored shirt which is the defendant."

 When M.M.'s testimony resumed, she recalled R.D. and M.H. had

an argument, during which defendant "told [M.H.] to step back" and

then "lift[ed] up his shirt showing . . . the gun." After she saw

the gun, M.M. ran inside and heard gunshots go off, but did not

see who shot R.D. She also could not recall if defendant had

pointed the gun at R.D.

 Da.M. testified there was no third unidentified person, that

only M.H. and defendant approached the stoop. She confirmed M.H.

and R.D. had an argument and defendant told M.H. "to move, get out

the way." She recalled seeing defendant point the gun at R.D.'s

head before shooting him, but explained the gun did not go off and

instead made a clicking sound when defendant pulled the trigger.

Then, "everybody took off running" into the apartment. She

remained, however, and saw defendant shoot R.D.

 Da.M. denied seeing M.H., or anyone other than defendant,

have a gun in their possession. Da.M. was also questioned about

her retraction letter. She admitted to writing the letter, but

testified she did see who shot R.D., despite the contents of the

 5 A-0772-14T2
letter.

 R.D. testified he and defendant were on good terms, and denied

ever having any problems with him. He knew defendant for about

twenty years and said they were "childhood buddies." He considered

defendant's two sons to be his "little cousins" and defendant to

be "like family." When asked about the prospect of "snitching on

a family member," R.D. stated, "I wouldn't do it if my heart

depended on it . . . [e]ven if it was the truth" because "family

[comes] before anything else."

 R.D. admitted defendant was present when he was shot, but

denied defendant was the one who shot him. Instead, he described

the shooter as a dark-skinned male whom he did not know. He

explained that, before he was shot, M.H., defendant, and another

male named Tyheem first approached him. They were later joined

by

 some fourth person . . . . And when I turned
 around the guy had a gun on me. My first
 reaction was to grab the gun. I didn't care
 who he was, what he was about, he had a gun.
 I grabbed the gun, we tussled, the gun went
 off, hit me twice.

 R.D. also stated the shooter put the gun to his head and

threatened to kill him, but when he pulled the trigger he realized

he ran out of bullets and took off running. He ran after the

shooter, but only made it to the sidewalk curb before retreating

 6 A-0772-14T2
back to the steps. He denied ever telling D.M. that defendant or

M.H. shot him.

 Sometime after the shooting, R.D. had a telephone

conversation with defendant and his son. He described the

telephone conversation in his testimony:

 Q. And at that point did the defendant
 tell you that, quote, [M.H.] got me
 in trouble?

 A. Yeah, he told me that everybody told
 on him, accused him as the shooter.

 Q. Okay. And did he ask you to give a
 taped statement to a defense
 investigator for him?

 A. No, he didn't ask me. What he asked
 me was, he asked me how can I
 help.
 I said well, you got to tell me
 who your lawyer is and I'll go to
 your lawyer and talk to your
 lawyer.
 He didn't – he said that he was
 waiting for his mom to get the
 lawyer and everything. And
 that's when his mom came and seen
 me and we went and seen the
 investigator Eric Johnson.

 . . .

 Q. When you had this phone
 conversation with the defendant did
 you tell the defendant that you
 would do whatever you could to
 help him out and make this case
 go away?

 A. I told him I'd do whatever it is to

 7 A-0772-14T2
 help him get out of trouble, yeah,
 because he in trouble for nothing.

 Q. Did you also tell him that you
 didn't want to testify though?

 A. No, I didn't tell him – I never told
 him that until like 2011 . . . .

 R.D. testified he went with defendant's mother to meet with

defendant's private investigator so he could give a taped

statement. He also admitted receiving $900 from defendant's family

after he was shot.

 Defendant did not testify at trial.

 Defendant was acquitted of first-degree attempted murder,

N.J.S.A. 2C:5-1, 2C:11-3(a)(1) (count one), and convicted of

second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count

two); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2)

(count three); second-degree possession of a handgun for an

unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); second-degree

unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count

five); and second-degree possession of a handgun for an unlawful

purpose by a certain person not to have weapons, N.J.S.A. 2C:39-

7(b) (count six).

 Defendant was sentenced to twenty-six years, which included

two eighteen-year concurrent sentences for counts two and five

subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2,

 8 A-0772-14T2
and an eight-year consecutive sentence for count six subject to a

five-year parole disqualifier. Counts three and four merged with

count two for sentencing.

 Defendant presents the following arguments in his appeal:

 POINT I

 THE TRIAL COURT ERRONEOUSLY DENIED
 DEFENDANT'S APPLICATION FOR A
 MISTRIAL WHEN [M.M.] IDENTIFIED AND
 DESCRIBED HIM IN COURT AS WEARING
 PRISON GARB AND COMPOUNDED THE
 PREJUDICE TO DEFENDANT ARISING FROM
 THE REMARK BY REPEATING [M.M.]'S
 IDENTIFICATION.

 POINT II

 THE PROSECUTOR ENGAGED IN MULTIPLE
 INSTANCES OF MISCONDUCT ON
 SUMMATION WHICH SINGULARLY AND
 CUMULATIVELY DEPRIVED DEFENDANT OF
 A FAIR TRIAL.

 POINT III

 DEFENDANT'S SENTENCE WAS MANIFESTLY
 EXCESSIVE.

 II.

 Defendant argues he suffered irreparable damage as the result

of M.M.'s description of him as wearing an "inmate suit" and that

the trial judge compounded the prejudice to him "by affirming

[M.M.]'s identification and description of his attire to the jury."

This argument merits only limited comment. R. 2:11-3(e)(2).

 In State v. Artwell, the Supreme Court described distinctive

 9 A-0772-14T2
prison garb as "clothing that allows the jury to 'visibly identify'

the wearer as a prisoner, such as a one-piece jumpsuit, 'detention

greens,' or any clothing with markings identifying it as a

correctional uniform." 177 N.J. 526, 534 n.1 (2003) (citations

omitted). It is undisputed that defendant was not wearing

distinctive prison garb. Therefore, this is not a case in which

the defendant was denied his right to a fair trial because he was

required to "appear at trial in distinctive prison garb." Id. at

534-35 (citing State v. Carrion-Collazo, 221 N.J. Super. 103, 112

(App. Div. 1987), certif. denied, 110 N.J. 171 (1988)). What

occurred here is that a witness made a factual error in her

testimony that, if accepted by the jury, could inure to defendant's

detriment. The trial judge endeavored to correct that error and

defense counsel did not consent to the use of curative action

rather than a mistrial.

 "A mistrial is an extraordinary remedy," State v. Goodman,

415 N.J. Super. 210, 234 (App. Div. 2010), certif. denied, 205

N.J. 78 (2011), that should only be granted "to prevent an obvious

failure of justice," State v. Harvey, 151 N.J. 117, 205 (1997),

cert. denied, 528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683

(2000). Because the trial court "has the feel of the case and is

best equipped to gauge the effect of a prejudicial comment on the

jury in the overall setting," State v. Winter, 96 N.J. 640, 647

 10 A-0772-14T2
(1984), "[a]n appellate court should defer to the decision of the

trial court . . . [and] will not disturb a trial court's ruling

on a motion for a mistrial, absent an abuse of discretion that

results in a manifest injustice," Harvey, supra, 151 N.J. at 205

(citation omitted); see also State v. Jackson, 211 N.J. 394, 407

(2012).

 Because the witness's factual error was one that could easily

be remedied, it was well within the trial judge's scope of

discretion to suggest a course of action that corrected the factual

error without resorting to the nuclear option of declaring a

mistrial. Moreover, the error was made in the course of the

witness identifying defendant. There is no suggestion she was

otherwise unable to do so or relied upon her impression that he

was wearing an "inmate suit" in making the identification. We

discern no abuse of discretion in the trial judge's decision to

pursue corrective action rather than declare a mistrial.

 III.

 Defendant argues he should be granted a new trial because the

prosecutor's statements in summation constituted prosecutorial

misconduct sufficiently egregious to deprive him of a fair trial.

To support this argument he cites statements characterizing the

State as the "real victim" in the case, and arguing defendant and

 11 A-0772-14T2
the victim conspired to fabricate the victim's testimony that

defendant did not shoot him.

 Defense counsel's summation relied heavily on the victim's

testimony as proof that defendant did not shoot him and advanced

the theory that the actual shooter was M.H.

 The State's summation first addressed the victim's testimony

that defendant was innocent with the assertion that

 this case is called the State of New Jersey
 versus Kazmeck Hollingsworth. It's not [the
 victim] versus Kazmeck Hollingsworth. [The
 victim] in some sense was the victim in this
 case because he's the person that was shot
 that day. The real victim in this case is the
 State of New Jersey, the citizens of New
 Jersey.

Defense counsel objected to the characterization of the State as

the victim. The trial judge overruled the objection, stating the

State was the plaintiff in this case and "crimes are considered

an offense generally against the citizens of the State."

 The prosecutor later argued R.D.'s testimony exonerating

defendant was a "lie" he crafted "around the truth" whereby "he

just switched who it was that he saw pulling the trigger at him."

She cited R.D.'s testimony that he considered defendant family and

"that snitching on a family member is the worst thing you could

do." She also suggested R.D.'s testimony was the product of

fabrication by him and defendant, noting in his telephone

 12 A-0772-14T2
conversation with defendant, R.D. stated "he would, quote, do what

he could to help him out and make this case go away." The

prosecutor explained,

 [R.D.] says some, quote, mystery fourth person
 comes up [to them]. This is the shooter, the
 mystery fourth person.
 And then he says well, initially we were
 actually calling him the third person. But
 since there was actually three of us already
 there, it was actually the fourth person.
 Yeah. Who are you talking about? Who was it
 that you were discussing who this mystery
 third person was? [R.D.] told you he talked
 to the defendant after the shooting. He was
 talking about the defendant, that's what they
 were putting together their story to say some
 mystery third person.

 [(Emphasis added).]

 Defense counsel objected, arguing the contents of the

telephone conversation were not in the record, and requested a

jury charge that counsel's statements were not evidence. The

trial judge overruled the objection because R.D. had testified

about the conversation and the prosecutor's comments about its

contents were reasonable inferences drawn from the evidence. He

found the comment similar to defense counsel's own argument that

the shooter was M.H. rather than defendant, an inference suggested

as an alternative explanation of the record.

 Defense counsel also requested that the jury "be instructed

forcefully that [the] conversation is not in the record." The

 13 A-0772-14T2
trial judge agreed to instruct the jury once again that it can

rely only on its own recollection of the evidence and cannot

consider counsels' statements evidence, and did so during the

final jury charge.

 When "a claim [is made] of prosecutorial misconduct with

respect to remarks in summation, the issue presented is one of

law" and, thus, reviewed de novo. State v. Smith, 212 N.J. 365,

387 (2012), cert. denied, 568 U.S. 1217, 133 S. Ct. 1504, 185 L.

Ed. 2d 558 (2013). The issue raised in claims of prosecutorial

misconduct "is two-fold: whether the prosecutor committed

misconduct, and, if so, 'whether the prosecutor's conduct

constitutes grounds for a new trial.'" State v. Wakefield, 190

N.J. 397, 446 (2007) (quoting State v. Smith, 167 N.J. 158, 181

(2001)), cert. denied, 552 U.S. 1146, 128 S. Ct. 1074, 169 L. Ed.

2d 817 (2008).

 "[P]rosecutors are afforded considerable leeway" when they

address the jury, provided "their comments are reasonably related

to the scope of the evidence." State v. Cole, ___ N.J. ___, ____

(2017) (slip op. at 32) (quoting State v. Frost, 158 N.J. 76, 82

(1999)). "Prosecutors should not make inaccurate legal or factual

assertions during a trial. They are duty-bound to confine their

comments to facts revealed during the trial and reasonable

inferences to be drawn from that evidence." Frost, supra, 158

 14 A-0772-14T2
N.J. at 85 (citation omitted). In addition, a prosecutor may not

express a personal belief or opinion as to the truthfulness of a

witness's testimony. State v. Marshall, 123 N.J. 1, 156 (1991),

cert. denied, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 694

(1993); State v. Staples, 263 N.J. Super. 602, 605 (App. Div.

1993).

 A prosecutor is, however, "entitled to argue the merits of

the State's case 'graphically and forcefully,' and is not required

to present those arguments as if he were addressing a lecture

hall." Smith, supra, 212 N.J. at 403 (quoting State v. Feaster,

156 N.J. 1, 58 (1998), cert. denied, 532 U.S. 932, 121 S. Ct.

1380, 149 L. Ed. 2d 306 (2001)). They "may strike hard blows

[but] not . . . foul ones." Feaster, supra, 156 N.J. at 59

(quoting Bergee v. United States, 295 U.S. 78, 88, 55 S. Ct. 629,

633, 79 L. Ed. 2d 1314, 1321 (1935)).

 "Notwithstanding the high standard to which a prosecutor is

held as he or she gives an opening statement or summation, 'not

every deviation from the legal prescriptions governing

prosecutorial conduct' requires reversal." Jackson, supra, 211

N.J. at 408-09 (quoting State v. Williams, 113 N.J. 393, 452

(1988)). A prosecutor's improper "comments are deemed to have

violated the defendant's right to a fair trial when they 'so

infect[] the trial with unfairness as to make the resulting

 15 A-0772-14T2
conviction a denial of due process.'" Id. at 409 (alteration in

original) (quoting State v. Koedatich, 112 N.J. 225, 338 (1988),

cert. denied, 488 U.S. 1017, 109 S. Ct. 813, 102 L. Ed. 2d 803

(1989)).

 In our review of the prosecutor's comments, the factors to

be considered include: "whether 'timely and proper objections'

were raised; whether the offending remarks 'were withdrawn

promptly'; . . . whether the trial court struck the remarks and

provided appropriate instructions to the jury [; and] . . .

whether the offending remarks were prompted by comments in the

summation of defense counsel." Smith, supra, 212 N.J. at 403-04

(citations omitted).

 Defense counsel registered his objection to each of the

comments challenged on appeal. The trial judge overruled each of

the objections but did give an additional instruction to the jury

regarding the fact that statements by counsel are not evidence,

as requested by defense counsel.

 It is a bit strained to contend that the State was the real

victim here, rather than R.D. While it is true that, as a general

rule, it is the State that brings a criminal prosecution, R.D.'s

status as the person who was shot and left bleeding in the street

surely cements his role as victim. To the extent this feeble

effort to diminish the weight of R.D.'s apparent lack of animosity

 16 A-0772-14T2
toward defendant was error, it was harmless beyond a reasonable

doubt for it surely lacked the capacity to infect the trial with

any unfairness. See State v. Ingram, 196 N.J. 23, 49 (2008)

(applying "harmless beyond a reasonable doubt" standard to

constitutional errors (quoting State v. Castagna, 187 N.J. 293,

312 (2006))).

 The other comments challenged on appeal concern the

prosecutor's arguments that R.D. was not being truthful in

asserting defendant did not shoot him and that he colluded with

defendant to fabricate his testimony that another, unidentified

person was the shooter. We stress that these comments did not

include an expression of personal belief that R.D. was lying.

 The evidence in the case included R.D.'s aunt's testimony

that she heard him exclaim at the time he was shot that he had

been shot by defendant and M.H. R.D.'s denial was reasonably

viewed within the context of his own testimony that he considered

defendant "family," that he wouldn't "snitch" on family "if [his]

heart depended on it . . . [e]ven if it was the truth," and his

own description of his conversation with defendant in which he

stated he told defendant he would "do whatever it is to help him

get out of trouble." In addition, R.D. testified he went with

defendant's mother to meet with defendant's private investigator

 17 A-0772-14T2
so he could give a taped statement. Finally, he admitted receiving

$900 from defendant's family after he was shot.

 Given this context, we conclude the prosecutor's comments

fell within the permissible range of reasonable inferences drawn

from the evidence and provide no grounds for reversal.

 IV.

 Finally, we turn to defendant's challenge to his sentence as

manifestly excessive.

 At sentencing, the trial judge found aggravating factor one,

N.J.S.A. 2C:44-1(a)(1), applied because the victim was shot

"multiple times" and was unarmed. He also found aggravating

factors three, six, and nine, N.J.S.A. 2C:44-1(a)(3), (6), (9),

and no mitigating factors. He determined the aggravating factors

"substantially and convincingly" outweighed the mitigating

factors. The trial judge merged counts three and four with count

two, finding there to be "just one assault here that occurred,"

requiring only one conviction "as a matter of constitutional

fairness."

 Defendant, who was thirty-six years old at the time of the

shooting, has an extensive adult criminal record. According to

his presentence report, this offense was his seventh indictable

conviction in New Jersey and he had one felony conviction in

federal court. Four of the New Jersey convictions and the federal

 18 A-0772-14T2
conviction were related to the illegal possession of firearms. He

served six terms in New Jersey state prisons. He also served two

federal sentences and was on supervised release at the time of

this offense. Defendant does not dispute the fact that a mandatory

extended term was required because his criminal history included

two predicate Graves Act offenses. See N.J.S.A. 2C:43-6.

 The trial judge applied the Yarbough1 factors to determine

whether the sentence for the certain persons offense (count six)

should be consecutive or concurrent. The trial judge recognized

the conduct charged in count six did not involve "a different time

and separate place" from the aggravated assault or "multiple

victims." However, he observed the two counts charged were

"separate offenses with distinct elements . . . intended to

prohibit different conduct." He also added that imposing a

concurrent sentence for count six would "bypass[] in substantial

measure" any "legislative intent to deter by way of the enactment

of the certain persons statute" because count six "would then be

essentially subsumed by the greater second degree aggravated

assault sentence in" count two. Defendant's five separate

convictions under counts two through six were characterized as

"somewhat numerous," even though some were merged. Based upon

1
 State v. Yarbough, 100 N.J. 627, 643-44 (1985), cert. denied,
475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986).

 19 A-0772-14T2
this reasoning, the trial judge imposed concurrent eighteen-year

sentences on counts two and five, both subject to NERA, and a

consecutive eight-year sentence with a five-year period of parole

ineligibility on count six.

 "Appellate review of sentencing decisions is relatively

narrow and is governed by an abuse of discretion standard." State

v. Blackmon, 202 N.J. 283, 297 (2010). The Supreme Court directs

appellate courts to determine whether:

 (1) the sentencing guidelines were violated;
 (2) the aggravating and mitigating factors
 found by the sentencing court were not based
 upon competent and credible evidence in the
 record; or
 (3) "the application of the guidelines to the
 facts of [the] case makes the sentence clearly
 unreasonable so as to shock the judicial
 conscience."

 [State v. Fuentes, 217 N.J. 57, 70 (2014)
 (quoting State v. Roth, 95 N.J. 334, 364-65
 (1984)) (alteration in original).]

 Appellate courts are "bound to affirm a sentence, even if

[they] would have arrived at a different result, as long as the

trial court properly identifies and balances aggravating and

mitigating factors that are supported by competent credible

evidence in the record." State v. O'Donnell, 117 N.J. 210, 215

(1989). An appellate court should modify a sentence "only when

the trial court's determination was 'clearly mistaken.'" State

v. Jabbour, 118 N.J. 1, 6 (1990) (quoting State v. Jarbath, 114

 20 A-0772-14T2
N.J. 394, 401 (1989)).

 Defendant contends the trial judge lacked a factual basis for

finding aggravating factor one and that this finding constituted

impermissible double-counting. Defendant also argues the

imposition of consecutive sentences was a manifest abuse of

discretion. He states the trial judge's finding that defendant

had numerous offenses was erroneous because it was relying upon

two convictions that merged and it erred in considering the certain

persons offense as having a separate purpose under Yarbough.

Finally, he argues the sentence was improper because the trial

judge "did not consider the real-time consequences of NERA" in

imposing his sentence.

 After reviewing these arguments in light of the record and

applicable legal principles, we conclude that defendant's

arguments regarding the imposition of a consecutive sentence for

the certain persons offense, his contention the trial judge

committed reversible error in failing to consider the consequences

of NERA2 and his criticism of the judge's reference to his offenses

2
 The trial judge did observe the impact of NERA on the time
defendant would serve, identifying the aggregate amount of time
he would be ineligible for parole. Moreover, the trial judge had
no discretion to impose a lesser parole ineligibility term given
NERA's mandate of "a minimum term of 85% of the sentence imposed,
during which the defendant shall not be eligible for parole."
N.J.S.A. 2C:43-7.2(a). In addition, "the impact of the eighty-
five percent period of parole ineligibility on the time defendant

 21 A-0772-14T2
as "numerous" lack sufficient merit to warrant discussion. R.

2:11-3(e)(2).

 We agree with defendant that the record of this case did not

support a finding of aggravating factor one. That factor directs

the sentencing court to examine "[t]he nature and circumstances

of the offense, and the role of the actor therein, including

whether or not it was committed in an especially heinous, cruel,

or depraved manner." N.J.S.A. 2C:44-1(a)(1). The fact that R.D.

was shot multiple times while unarmed falls short of "the

extraordinary brutality" contemplated in Fuentes, supra, 217 N.J.

at 75. For this factor to apply, the cruelty must be such that

the infliction of pain is an end in itself. O'Donnell, supra, 117

N.J. at 216. There was no double-counting here, however, because

it is not an element of aggravated assault that the victim is

unarmed. See State v. Lawless, 214 N.J. 594, 608 (2013); State

v. Pineda, 119 N.J. 621, 627 (1990).

 The trial judge stated he gave "substantial weight" to all

the aggravating factors he found and stated he gave factor one

"very heavy weight." He noted further that in weighing the

factors, he considered them "on a qualitative as well as

would spend in custody [is] not [a] statutory mitigating factor[]
and thus [does] not need to be addressed by [the judge] in
sentencing." State v. Bieniek, 200 N.J. 601, 610 n.1 (2010).

 22 A-0772-14T2
quantitative basis" and concluded the aggravating factors

outweighed the non-existent mitigating factors "substantially and

convincingly."

 If aggravating factor one is removed from the equation, the

record provides ample evidence to support the remaining

aggravating factors, none of which are disputed by defendant. He

also does not contend the trial judge erred in failing to find any

mitigating factor or in finding the aggravating factors

preponderated "substantially and convincingly."

 Given the deference paid to a trial judge's discretion in

imposing sentence, "we will exercise that reserve of judicial

power to modify sentences when the application of the facts to the

law is such a clear error of judgment that it shocks the judicial

conscience," a power that is not to be invoked frequently. Roth,

supra, 95 N.J. at 364. Here, even though it was error to find

aggravating factor one, the sentence imposed is supported by the

remaining factors and the weight the trial judge accorded them.

We do not conclude the error amounted to a clear error in judgment

that shocks the judicial conscience but rather, we determine,

under the circumstances of this case and this defendant, such

error was harmless.

 Affirmed.

 23 A-0772-14T2